**HEART OF AMERICA NORTHWEST, et al., Plaintiffs,**

v.

**WESTINGHOUSE HANFORD COMPANY, et al., Defendants.**

**No. CY–92–144–AAM.**

United States District Court, E.D. Washington.

April 15, 1993.

Corrie J. Yackulic, Michael E. Withey, Schroeter Goldmark & Bender, Seattle, WA, James Hecker, Trial Lawyers for Public Justice, Thomas Carpenter, Government Accountability Project, Washington, DC, for plaintiffs.

William R. Squires, III, Stuart R. Dunwoody, Davis Wright Tremaine, Seattle, WA, for defendant Westinghouse Hanford Co.

Robin Juni, U.S. Dept. of Justice, Environment & Natural Resources, Washington, DC, for defendant U.S. Dept. of Energy.

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS

McDONALD, District Judge.

On March 8, 1993 the court heard oral argument on Defendant United States' Motion to Dismiss Plaintiffs' First Amended Complaint, Ct. Rec. 24, and on Motion of Defendant Westinghouse Hanford Company to Dismiss Amended Complaint, Ct. Rec. 27. Robin Juni represented defendant United States; William Squires represented defendant Westinghouse Hanford Company; Michael Withey represented plaintiffs; and Jay Manning represented the State of Washington in its capacity as amicus.

For the reasons discussed more fully below, the court finds that plaintiffs have standing to pursue all causes of action. Accordingly the court is denying the United States' motion to dismiss to the extent it is based on standing. Further, the court finds that all causes of action are barred by the Superfund timing of review provisions. Accordingly, the court is granting Westinghouse's motion to dismiss to the extent it is based on section 113(h) of Superfund. Having found that section 113(h) bars the court from hearing the action, the court is dismissing the action and refraining from ruling on the other asserted grounds for dismissal.

## PROCEDURAL BACKGROUND:

Heart of America Northwest (HOA) and Legal Advocates of Washington filed a complaint against Westinghouse Hanford Company (WHC), James Watkins in his capacity as Secretary of Energy, and the United States Department of Energy (DOE). HOA and Legal Advocates of Washington are non-profit groups whose primary missions are research, education, and advocacy oriented toward improving the quality of the environment. Both groups have members who live and work near the Hanford facility and who use the area around Hanford, including the Columbia River, for aesthetic, environmental, and recreational activities. The groups and their members are involved in monitoring activities at Hanford as well as participating, to the extent possible, in the decision making process surrounding the site's cleanup.

The complaint asserts two causes of action. The first is against WHC alone and concerns discharges of contaminated waters into the soil at Hanford, which the plaintiffs contend constitute unpermitted discharges under the Clean Water Act. The second is against both WHC and the federal defendants and concerns releases of hazardous substances. Plaintiffs contend that the releases have not been properly reported under provisions of the Resource Conservation and Recovery Act (RCRA) and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, aka Superfund).

Both the United States and Westinghouse filed motions to dismiss on the grounds that the court lacks subject matter jurisdiction, plaintiffs lack standing, and plaintiffs fail to state a claim upon which relief can be granted. Ct.Rec. 8, 13. Rather than respond to the motions to dismiss, plaintiffs filed a First Amended Complaint that substantially tracked the first complaint but added several new allegations. Ct.Rec. 21.

In response to the First Amended Complaint, the United States and Westinghouse have again submitted motions to dismiss, Ct. Rec. 24, 27, that are nearly identical to their initial motions to dismiss. The court therefore assumes that defendants' motions to dismiss the First Amended Complaint supersede the motions to dismiss the original complaint. Accordingly, the court considers the motions to dismiss the original complaint to be moot, and by this order disposes only of the motions to dismiss the first amended complaint.

The United States moves to dismiss pursuant to Rule 12(b)(1) and 12(b)(6), lack of subject matter jurisdiction and failure to state a claim. Its argument on subject matter jurisdiction is based on the contention that plaintiffs lack standing and that plaintiffs failed to give proper notice of their intent to sue. DOE's argument on failure to state a claim is based on plaintiffs' failure to allege that the defendants released a "reportable quantity" of hazardous substances as required by CERCLA. Ct.Rec. 26.

WHC also moves to dismiss pursuant to Rule 12(b)(1) and 12(b)(6). It bases its subject matter jurisdiction argument on CERCLA section 113(h). Section 113(h) deprives federal district courts of subject matter jurisdiction regarding any challenges to ongoing remedial efforts at Superfund sites. WHC argues that both of plaintiffs' causes of action challenge remedial efforts at Hanford, which are embodied in the Federal Facility Agreement (FFA), and that this court is therefore barred from hearing the case by section 113(h).

Should the court find that section 113(h) is not a complete bar to the action, WHC further argues that the Clean Water Act claims must be dismissed as the Act does not apply to the discharges at issue. WHC also argues that plaintiffs' claims are barred by the government's diligent enforcement actions.

Shortly before the court was to hear oral argument on the motions, the State of Washington sought leave to file an amicus brief to address the 113(h) argument. The court granted Washington leave to file.

This court has previously considered the application of section 113(h) to the activities at Hanford, including activities covered by the FFA. In its *In re Hanford Nuclear Reservation Litigation* ruling on motions to dismiss, the court found that section 113(h) deprived the court of jurisdiction over those plaintiffs' claims that concerned abatement and remediation of alleged health hazards, as

well as those claims that concerned medical monitoring and surveillance. 780 F.Supp. 1551 (E.D.Wash.1991).

**FACTS:**

Section 120 of CERCLA establishes a process for identifying and responding to potentially dangerous hazardous waste sites at federal facilities. Section 120 first requires the establishment of a Federal Agency Hazardous Waste Compliance Docket. 42 U.S.C. § 9620(c). The Administrator of the Environmental Protection Agency must collect in the docket substantial information on federal facility hazardous waste sites. The Administrator is further required to evaluate those sites on the docket under CERCLA criteria for possible inclusion on the CERCLA National Priorities List (NPL). 42 U.S.C. § 9620(d). If a site is placed on the NPL, section 120 establishes the procedure for selecting and implementing a plan for remedial action. 42 U.S.C. § 9620(e).

EPA listed the Hanford site on the Federal Agency Hazardous Waste Compliance Docket in February, 1988. Ct.Rec. 26 at 7. In June, 1988, EPA proposed listing four subareas at Hanford, the 100, 200, 300, and 1100 areas, on the NPL. On October 4, 1989, EPA published notice of the formal listing of the four subareas of Hanford on the NPL.

In May, 1989, in anticipation of Hanford being listed on the NPL, the Department of Energy, Environmental Protection Agency, and Washington Department of Ecology entered into the Hanford Federal Facility Agreement and Consent Order (FFA), also known as the Tri–Party Agreement (TPA). The Agreement describes the legal authorities, rights, and duties of the parties. The Agreement includes by reference an Action Plan which is to implement the terms of the Agreement.

The Action Plan identifies major milestones agreed to by all of the parties. Action Plan at 1–3. The milestones are divided into three major categories; disposal of tank wastes; cleanup of past-practice units; and permitting and closure of Treatment, Storage, and Disposal (TSD) units. The liquid discharges which plaintiffs challenge in their first cause of action are governed by Milestone M–17, which is in the category covering permitting and closure of TSD units. The tanks from which plaintiffs' second cause of action alleges there have been unreported leaks are governed by the Action Plan's section on disposal of tank wastes.

Both the Agreement and the Action Plan contain provisions governing amendments or revisions. Pursuant to these provisions, the parties negotiated the revision of Milestone M–17. In December, 1991, the parties agreed to an amendment of Milestone M–17 which was formally approved in August, 1992.

At the same time that the parties agreed to the amendment of Milestone M–17, DOE and Ecology entered into a Consent Order in which DOE agreed to make certain discharges subject to Washington's Water Pollution Control Act. The parties agreed that the Consent Order was "consistent in substance to a proposed amendment" to Milestone M–17 of the FFA. Ct.Rec. 67, Ex. 2, (Consent Order) at 2. The relationship of the Consent Order to the FFA is described as follows: "this Consent Order is separate and legally distinct from the HFFACO [FFA]. However, Ecology intends to maintain consistency with Milestone M–17–00 in the HFFACO in implementing this Consent Order." *Id.*

**DISCUSSION:**

As discussed above, defendants have raised many arguments in their motions to dismiss. The court, however, is only addressing the two most substantial threshold issues of standing and jurisdiction under section 113(h). Because the court finds the plaintiffs have standing to prosecute their claims, it must address section 113(h)'s jurisdictional bar. However, as section 113(h) compels dismissal of the action, the court refrains from making what would effectively be advisory decisions on the remaining issues: notice of intent to sue, diligent prosecution, applicability of the Clean Water Act, and failure to state a claim.

**1. Standing to sue**

Both defendants challenge plaintiffs' standing to bring the instant action. Because the federal defendants are only named in the

second cause of action, which alleges failure to report releases, those defendants only argue that plaintiffs lack standing to bring the second cause of action.

Defendant Westinghouse, on the other hand, challenges plaintiffs' standing to bring both causes of action. Ct.Rec. 29, at 11. As to the second cause of action, however, Westinghouse does not independently argue standing. Instead, it concurs in the government's argument. *Id.*

■ The party invoking federal jurisdiction bears the burden of establishing that it has standing to pursue the action. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990). The test for whether or not a party has standing consists of three elements. The most recent Supreme Court expression of these elements is as follows:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely" as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted).

■ An organization can establish standing either by demonstrating that its members suffered injury in fact for which the organization can sue in its representational capacity, or by demonstrating that the organization itself has suffered injury in fact. *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). Plaintiffs attempt to establish standing in both their representational and organizational capacities. The government argues that, as to the second cause of action, alleged failure to report releases, plaintiffs fail to establish injury

in fact to either their members or to the organizations themselves. Accordingly, the government argues plaintiffs lack standing and the court must dismiss the second cause of action.

As discussed below, the court finds that plaintiffs have standing in their representational capacity to prosecute both the first and the second causes of action. Accordingly, the court does not address plaintiffs' and the governments' substantial argument over whether plaintiffs have established organizational standing to prosecute the second cause of action.

## A. CERCLA and RCRA notice claims (second cause of action)

### i. Injury in fact

■ The government first argues that plaintiffs' claims of injury suffered by their members are merely conclusory allegations and generalized grievances. Ct.Rec. 26 at 11–16. The government argues that without particular facts showing that specific members suffer distinct and palpable injury, plaintiffs' interest in an event or issue, no matter how passionate, will not suffice to establish injury in fact. *See United States v. AVX Corp.,* 962 F.2d 108 (1st Cir.1992).

*AVX* supports the proposition that mere generalized allegations will not support a finding of injury in fact. *Id.* at 115. In that case, however, aside from the general averment of injury to the organization's members, no members were identified by name, no specific allegations were made that members lived near the affected area, and no allegations were made as to the extent and frequency of members' use of the affected area. "In short, the asserted injury is not anchored in any relevant particulars." *Id.* at 117.

In contrast, plaintiffs here have alleged, both in their complaint, and through members' affidavits, numerous instances of specific injury in fact. *See* Ct.Rec. 21, 36–39. The principal injury which the members allege is the violation of their right to use the area around the Hanford facility without being exposed, either knowingly or unknowingly, to

harmful pollutants allegedly released without proper notice. Ct.Rec. 35 at 7.

Examples of specific injuries to plaintiffs' members are found in the affidavits of Stan Staats, Ct.Rec. 37, and Cyndy deBruler, Ct. Rec. 39. Both live in the affected area, and both detail the ways in which they routinely use the affected area, as well as the ways in which their use is immediately threatened by alleged releases of hazardous substances. The facts alleged in these affidavits are clearly sufficient to meet the test for particularity of injury both as discussed in *AVX* and as repeatedly considered by the Supreme Court. *See, e.g., Lujan v. Defenders of Wildlife,* — U.S. —, —, 112 S.Ct. 2130, 2137–38, 119 L.Ed.2d 351 (1992) (member's alleged injury in fact must be supported by concrete plans to revisit the area where they would suffer impact of proposed action); *Japan Whaling Ass'n v. American Cetacean Soc.,* 478 U.S. 221, 230 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986) (whale watching and studying interests of organization's members sufficiently affected by continued whale harvest to constitute injury in fact).

■ Plaintiffs' members also allege injury to their right to be informed in a timely manner of any releases from the facility so that they may take whatever precautionary steps are necessary. *See, e.g.,* Ct.Rec. 37 at 5, Ct.Rec. 38 at 3. This alleged injury is to plaintiffs' members' specific interest in receiving the type of notice provided for by CERCLA § 111(g), which requires appropriate notice to potentially injured parties when there has been a release of a hazardous substance. 42 U.S.C. § 9611(g).

The government further argues that plaintiffs have failed to allege injury in fact because the alleged injury results from releases, not from the failure to give notice. This argument is more appropriately considered in the discussion of causality than in the discussion of injury in fact. Similarly, the government argues that plaintiffs have failed to allege injury in fact because the information they seek is already publicly available and therefore any alleged injury has effectively been cured. This argument is more appropriately considered in the discussion of whether plaintiffs' injuries can be redressed than in the discussion of injury in fact.

Plaintiffs allege injury both to their rights not to be exposed to harmful releases and to their right to receive timely notice. Such allegations, supported as they are by affidavits with specific factual grounding, are sufficiently particularized and actual or imminent to support a finding of injury in fact. Accordingly, the court finds that plaintiffs have established injury in fact on behalf of their members for the purposes of the notice claims.

### ii. Causality

■ As noted above, the government argues that, even if exposure to released hazardous substances is sufficient injury in fact, plaintiffs have still failed to allege that the injury results from the alleged failure to give notice. First, the government argues that plaintiffs have failed to allege how any failure to give the notice required by CERCLA § 103(c) and RCRA § 3010, notice that should have been given to EPA over ten years ago, is causally connected to the asserted injury. Second, the government argues, plaintiffs have failed to allege the necessary causal connection between failure to give the notice required by CERCLA § 103(a) and (b), where the notice is to be given to the EPA, not to plaintiffs.

The government does not address plaintiffs' CERCLA § 111(g) claim. Under that claim, plaintiffs' injury is to their right to be notified of certain releases. Clearly, the government can not contest that there is a causal connection between its alleged failure to provide those notices and plaintiffs' alleged injury, i.e. non-receipt of notice.

Plaintiffs respond to the government's causation argument by stating that their environmental interests are injured through the following causal chain: without the required notices of alleged releases, regulatory agencies are without knowledge of the releases. Consequently, the agencies are impeded from adequately mitigating releases, and plaintiffs, who use the affected environment, are therefore injured by potential exposure to the hazardous releases.

Plaintiffs cite numerous Clean Air Act cases where "similar allegations of injury" were sufficient. However, by plaintiffs own summary of these decisions, they concern suits to compel direct cleanup or regulation of pollution, not to compel compliance with reporting or notice requirements. More compelling is plaintiffs' citation to cases under the Clean Water Act's citizen suit provision where courts have found that environmental groups had standing to challenge violations of reporting requirements. *See, e.g., Sierra Club v. Simkins Industries, Inc.,* 847 F.2d 1109 (4th Cir.1988), *cert. denied,* 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989).

In *Simkins,* the Sierra Club sued to enforce the reporting requirements contained in a National Pollution Discharge Elimination System (or Clean Water Act) permit. The court held that plaintiffs had standing to bring the suit, accepting claims of injury, causation, and redressibility substantially similar to those advanced by plaintiffs here. The alleged injury in fact was that one or more members would be adversely affected by pollution of a river which plaintiff's members used much as plaintiffs' members here use the Columbia. The court held that the injury was fairly traceable to the failure to report as the loss of information on actual discharges impaired the ability of present and future regulators to mitigate pollution. The court further held that the requested relief, declaratory relief, injunctive relief, and civil penalties was sufficiently likely to redress plaintiffs injury to support standing. *Id.* at 1113.

The government seeks to distinguish *Simkins* and the other Clean Water Act cases by arguing that the cases concerned citizen enforcement of government issued permits. It states that, in contrast, plaintiffs here are trying to circumvent a government approved and monitored cleanup. The government does not flesh out this argument.

While this argument has substantial merit in the context of this court's jurisdiction under CERCLA section 113(h), it is unconvincing in the context of the standing debate. Comparison of the citizen suit provisions of the Clean Water Act and CERCLA demonstrate the lack of merit to the government's attempt to distinguish the case at bar from the Clean Water Act cases.

The Clean Water Act citizen suit provision under which the *Simkins* plaintiffs sued is substantially similar to the CERCLA citizen suit provision under which plaintiffs have sued in the case at bar. The only difference of note is that the Clean Water Act provision is limited to persons who are in violation of effluent standards, limitations, or orders with respect to such limitations. 33 U.S.C. § 1365(a)(1). Accordingly, the *Simkins* plaintiffs alleged violation of the reporting requirements incident to a discharge permit.

The CERCLA citizen suit provision, on the other hand, is more broad, it speaks to alleged violations of any standard, regulation, condition, requirement or order that becomes effective under the statute. 42 U.S.C. § 9659(a)(1). Accordingly, plaintiffs here allege violations of both the statute and the implementing regulations. *See, e.g.,* Ct.Rec. 21 at 14.

The government further argues that plaintiffs' assertion of standing here is the same as that which the Supreme Court denied in *Lujan v. Defenders of Wildlife,* that is, suing to compel remedy of a procedural injury without proof of an injury in fact to a specific member. In *Lujan* the court found that plaintiffs had not alleged injury in fact to any of its members. —— U.S. at ——–——, 112 S.Ct. at 2137–40. Having so found, the Court held that plaintiffs alleged violation of procedures required under the statute was not sufficient, in and of itself, to confer standing.

The Court specifically stated that *Lujan* was "not a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs." *Id.* at ——, 112 S.Ct. at 2142. The Court further stated that "We do *not* hold that an individual cannot enforce procedural rights; he assuredly can, so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.* at —— n. 8, 112 S.Ct. at 2143 n. 8 (emphasis in original). As exam-

ples of suits to enforce procedural rights in which plaintiffs had alleged sufficient underlying injury in fact, the Court cited *Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), where members' whale watching and studying would be adversely affected by continued whale harvesting, and *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989), where members of a citizen's council for the area in which the challenged construction was to occur "would obviously be concretely affected." *Lujan,* —— U.S. at —— n. 8, 112 S.Ct. at 2143 n. 8.

Because plaintiffs here allege specific individual injury to legally protected interests, their case is clearly distinguishable from *Lujan*. Instead, their allegations, supported as they are by affidavits, put the case squarely in line with those cases the Court cites where plaintiffs have standing to sue to enforce procedural violations when the procedures are designed to protect some threatened concrete interest of plaintiffs.

The government itself has conceded that the purpose of the CERCLA and RCRA notice requirements is to provide the EPA and other regulatory agencies with the information they need to assess hazards and mitigate potential injury from releases. Ct.Rec. 26 at 13. The government therefore concedes that the procedures which plaintiffs seek to enforce are designed to protect plaintiffs' concrete interest in avoiding exposure to hazardous substances in the environment. Accordingly, the court finds that plaintiffs' alleged injury is causally connected to the conduct complained of, that is, it is fairly traceable to the challenged actions of the defendants.

### iii. Likelihood that plaintiffs' injury will be redressed

■ Finally, the government argues that any possible injury plaintiffs may assert under the various notice provisions is cured by the fact that the information which such notices would provide is already publicly available. Accordingly, the government argues, a decision on the merits favorable to plaintiffs would not redress any such injury. Ct.Rec.

26 at 13–16. As evidence that the information that would be contained in notices is publicly available, the government cites to the Federal Facility Agreement and the Action Plan. The government also cites to the fact that plaintiffs have obtained information regarding some releases, which information forms the basis of plaintiffs' suit.

Plaintiffs respond that, while they have notice of some alleged releases at Hanford, this does not absolve the government of the procedural requirement that the operator of a facility report all releases of reportable quantities of hazardous substances. Plaintiffs allege that the remedy they seek will increase the probability of government action in response to releases, and therefore will redress plaintiffs' environmental injury. Ct. Rec. 35 at 13. Further, with regard to plaintiffs' CERCLA § 111(g) claim, the remedy plaintiffs' seek, actual notice, would directly remedy plaintiffs' injury to their statutory right to be notified of certain releases.

■ The government implies that compliance with the notice provisions at issue is not likely to change the course of cleanup activities at Hanford because the appropriate government agencies already possess substantial information on releases and threatened releases. Ct.Rec. 26 at 14. To establish standing, however, plaintiffs are not required to show to a certainty that a favorable decision will redress the injury of which they complain. Rather, they must show that it is likely, and not merely speculative, that the injury will be redressed. *Lujan,* —— U.S. at ——, 112 S.Ct. at 2136.

■ Although the appropriate agencies may be already know of the alleged releases, and may be diligently pursuing appropriate response actions, such defenses are inappropriate in a challenge to standing where what the plaintiff seeks is enforcement of a statute Congress has designed in part for plaintiffs' benefit. *See, e.g., Women's Equity Action League v. Cavazos*, 879 F.2d 880, 886 (D.C.Cir.1989) ("due respect for the legislative branch requires us to recognize that vigorous enforcement of laws Congress designed for plaintiffs' benefit has the potential

to redress in meaningful measure plaintiffs' injury").

As the government itself has stated, the notice requirements (other than § 111(g)) are designed to enable the appropriate government agencies to respond to certain releases. Ct.Rec. 26 at 13. It is therefore reasonable for the court to find that if defendants complied with the notice requirements, then the appropriate government agencies might respond to the releases in a way that would be more protective of plaintiffs' environmental interests than are the current cleanup efforts. Accordingly, the court finds that plaintiffs' alleged injury is likely to be redressed by a decision on the merits that is favorable to plaintiffs.

Having found that the claims plaintiffs raise in their second cause of action meet all three elements of the standing test, that is, injury in fact, a causal connection between the injury and the challenged action of defendants, and a likelihood that the injury will be redressed by a favorable decision, the court holds that plaintiffs have standing to pursue their second cause of action. Accordingly, **IT IS HEREBY ORDERED** that, to the extent the government's and Westinghouse's motions to dismiss are based on lack of standing, they are **DENIED.**

### B. Clean Water Act claims (First cause of action)

No party seriously argues plaintiff's standing to bring the first cause of action, the Clean Water Act claims. Defendant Westinghouse's initial argument on the issue consists of the following: "[plaintiffs'] conclusory allegations of harm also fail to confer standing to assert the first cause of action." Ct. Rec. 29 at 11. Even this minimal argument is apparently retracted in Westinghouse's reply, which states that, although the allegations of the complaint were insufficient to establish standing, "the affidavits of three of plaintiff members may suffice to establish standing at the pleading stage. WHC ... reserves the right to challenge plaintiffs' standing to assert the Clean Water Act claims, if necessary, at a later point." Ct. Rec. 44 at 8 (citation omitted).

The court, however, is under an independent obligation to examine standing as an element of its jurisdiction. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990). Based on plaintiffs' complaint and the affidavits submitted in conjunction with the motions to dismiss, plaintiffs have clearly established representational standing to bring their first cause of action. *See, e.g., United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

Plaintiffs' injury in fact is the alleged exposure of individual members to the environmental contamination caused by illegal discharges. The affidavits contain many examples of specific, non-conjectural ways in which plaintiffs' members routinely use the area around the Hanford facility and so are routinely exposed to the environment affected by alleged illegal discharges.

Further, the causal connection between the alleged injury and the conduct complained of is direct and unchallenged. One of the principal purposes of Clean Water Act permits is to regulate discharges to navigable waters, thereby mitigating environmental degradation and protecting human health. There is therefore a causal connection between the alleged conduct, failure to comply with the Clean Water Act, and the alleged injury, exposure to human health hazards created by discharging in violation of the Act.

Finally, it is highly likely that the alleged injury would be redressed by a favorable decision on plaintiffs' claim. If the court found the discharges at issue were subject to Clean Water Act regulation and ordered compliance with the Act, the plaintiffs' alleged injury, exposure to unpermitted discharges, would be effectively redressed.

The court therefore finds that plaintiffs' have met all three elements of the standing test and established their standing to prosecute their Clean Water Act claim. Accordingly, **IT IS HEREBY ORDERED** that, to the extent Westinghouse's motion to dismiss is based on plaintiff's lack of standing to prosecute to their first cause of action, the motion is **DENIED.**

## 2. Section 113(h): timing of review and subject matter jurisdiction

The jurisdictional statute at issue reads as follows:

### (h) Timing of Review

No Federal court shall have jurisdiction under Federal law ... to review any challenges to removal or remedial action selected under section 9604 of this title [Superfund section 104] ... in any action except one of the following:

....

(4) An action under section 9659 of this title (relating to citizen suits) alleging that the removal or remedial action taken under section 9604 of this title ... was in violation of any requirement of this chapter....

42 U.S.C.A. § 9613(h) (1992 Supp.)

In the case at bar, the critical debate revolves around whether the actions which plaintiffs' claims address constitute removal or remedial actions selected under section 104. If so, and if plaintiffs' claims challenge those actions, then the court must dismiss the claims for lack of subject matter jurisdiction.

Broadly stated, the parties' arguments are as follows. Defendants argue that: several areas at Hanford have been listed as Superfund sites on the National Priorities List (NPL); the Hanford Federal Facility Agreement and Consent Order (FFA), also known as the Tri–Party Agreement (TPA), is a Superfund cleanup plan under section 104 that establishes the remedial actions to be taken at the Hanford Superfund sites; plaintiffs' claims challenge activities occurring under the auspices of the FFA; and plaintiffs' claims are therefore barred by section 113.

Conversely, plaintiffs and the State of Washington argue that the FFA has two distinct parts controlling activities at Hanford. The first (Part II) concerns RCRA compliance, and the second (Part III) concerns Superfund removal or remedial actions. Because the activities plaintiffs challenge fall outside of the Superfund section of the FFA, plaintiffs and the state argue the jurisdictional bar of section 113 does not apply. They argue that the court should not construe the FFA so broadly as to find that any activity conducted under it is shielded from judicial review.

Resolution of this dispute requires the court to determine the scope of section 113(h) in reference to the activities at Hanford. Although the statute's language is fairly simple, the cases interpreting it have given it extremely broad meaning.

The statute only bars suits that challenge remedial actions selected under section 104. Plaintiffs have chosen activities that have not been specifically dubbed "remedial actions." The challenged actions are, however, being taken under the auspices of the FFA, which the court finds to be an integrated plan for remedial action at Hanford. While the FFA does include state participation, and does characterize some activities as RCRA compliance activities rather than as Superfund cleanup, the court finds that this results from an effort to develop a cooperative, integrated plan capable of handling the phenomenally complicated task of cleaning up the site, and not from a desire to create a plan neatly divided into Superfund and non-Superfund activities.

Plaintiffs and the state contend that the court could let the case proceed and make a final determination as to the jurisdictional issue at the remedy stage. Defendants strongly object to this suggestion. The court finds that there is no authority for postponing the determination of jurisdiction where the jurisdictional facts are separable from the merits of the case. As this court noted in *In re Hanford Nuclear Reservation Litigation,* 780 F.Supp. 1551, 1560 (E.D.Wash. 1991), where jurisdiction is lacking at the outset of litigation, the district court lacks the power to do anything other than dismiss the case.

### A. Standard of review: motions to dismiss for lack of subject matter jurisdiction

The party asserting that jurisdiction exists bears the burden of so proving in a Rule 12(b)(1) motion. 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1350 (1990). Where reso-

lution of the jurisdictional issue is separable from resolution of factual disputes as to the merits of the case, the court may consider evidence presented on the jurisdictional issue, and, if necessary, resolve disputes as to jurisdictional facts. *Thornhill Publishing Co. v. General Tel. & Elec.,* 594 F.2d 730, 733 (9th Cir.1979). When resolving disputed jurisdictional facts, the court may review any evidence, including affidavits and testimony, without converting the motion into one for summary judgment. *McCarthy v. United States,* 850 F.2d 558, 560 (9th Cir.1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989). No presumptions as to truthfulness apply to allegations of jurisdictional facts. *Augustine v. United States,* 704 F.2d 1074, 1077 (9th Cir.1983) (citing *Thornhill*).

In the case at bar, the dispute over jurisdictional facts concerns whether or not the activities which plaintiffs' claims would affect are remedial actions under section 104. The dispute on the merits concerns whether or not certain liquid discharges must be permitted under the Clean Water Act, and whether the Hanford operators must provide notice of certain hazardous substance releases. Resolution of the jurisdictional issue is therefore distinct and separable from resolution of the merits of the claim. Accordingly, the court can and must resolve the jurisdictional issue, including factual disputes, before allowing the case to proceed on the merits. *See In re Hanford,* 780 F.Supp. at 1560.

**B. The scope of section 113(h)**

The following discussion outlines the contours of section 113 as the courts have interpreted it. The discussion does not directly track the arguments made by parties in this case. It is presented, however, to place the arguments that have been made in context, and to demonstrate the consistency of courts' opinions that virtually any challenge to ongoing activities at Superfund sites is shielded from judicial review.

Section 113(h), by its plain language, applies to "any challenges to removal or remedial action selected under section 9604 [CERCLA section 104]." 42 U.S.C. § 9613(h). Courts interpreting section 113(h) have addressed several issues; whether a claim constitutes a "challenge" as opposed to being collateral to or merely supplementary to remedial actions; whether the challenged activities are part of a "removal or remedial action" that has been "selected;" and whether the remedial actions challenged are "under section 9604." Although the cases do not always fit neatly into these categories, the following discussion is so divided for clarity of presentation.

***i. Challenge***

Plaintiffs in several cases have argued that their claims were not in fact challenges to a response action, but were instead collateral or supplementary to the Superfund response action. This court considered such an argument in *In re Hanford.* The court rejected the argument that a claim for "abatement and remediation" of the risk posed by the underground tanks was collateral to the tank cleanup efforts outlined in the FFA. *In re Hanford,* 780 F.Supp. at 1559. The court reasoned that, in order to provide the relief which plaintiffs sought, the court could not avoid interfering with the cleanup efforts set out in the FFA. Accordingly, plaintiffs' characterization of the claim notwithstanding, it was, in a pragmatic sense, clearly a challenge to the FFA's cleanup plan, and was therefore barred by section 113.

Plaintiffs in other cases have argued that a suit seeking enforcement of a statute other than CERCLA does not constitute a challenge to ongoing CERCLA response actions. In *Reynolds v. Lujan,* 785 F.Supp. 152 (D.N.M.1992), plaintiffs brought suit to enforce provisions of RCRA at a federally owned facility that was listed on the CERCLA National Priorities List. Plaintiffs sought an order compelling comprehensive cleanup of the site. The court held that section 113(h) prevented the challenge, even though it was not based on CERCLA, because the court could only grant the relief plaintiffs sought by altering the ongoing response actions. Again, the court applied a pragmatic approach when determining what constitutes a challenge to a CERCLA response action under section 113.

Similarly, in *Schalk v. Reilly*, 900 F.2d 1091 (7th Cir.), *cert. denied*, 498 U.S. 981, 111 S.Ct. 509, 112 L.Ed.2d 521 (1990), plaintiffs argued that their claim was not a challenge to the consent decree governing the cleanup, but rather sought to ensure that certain procedural requirements were complied with. As in the other cases concerning the meaning of "challenge," the court found that a challenge to the procedure used for selecting a remedy would necessarily impact implementation of the remedy. *Id.* 900 F.2d at 1097. Again, the court was concerned with the practical impact of judicial intervention on the implementation of cleanup.

In all of these cases, and others like them, the inquiry for the court is whether the court's intervention would impact implementation of a response action. This inquiry is a pragmatic one that compares the relief sought by the plaintiffs with the remedial plans being pursued by the responsible parties.

### ii. Removal or remedial actions that have been selected

The breadth of section 113, as interpreted by the courts, is best demonstrated by the range of Superfund related activities that courts have found shielded from review by section 113. Courts interpreting section 113 have often looked to the statute's purpose, preventing delay of cleanups by prohibiting judicial intervention. In so doing, the courts have found virtually all agency activities, both before and after formal "selection" of a remedial plan, to be shielded from judicial review.

The most stark example of section 113's breadth was *United States v. Colorado*, 33 Env't Rep.Cas. 1585, 1991 WL 193519 (D.Colo.1991), *rev'd in part*, 990 F.2d 1565 (10th Cir.1993). In that case, the court had been involved for years in a dispute between the state and the federal government over whether the state could assert its authority under its hazardous waste management act to compel a cleanup of a hazardous waste disposal pond. The pond was located at the Rocky Mountain Arsenal, parts of which had been listed as a Superfund site and were being addressed under a Federal Facilities Agreement. The pond, however, had not initially been listed on the NPL.

In earlier proceedings, the court had found that, because the pond had not been listed on the NPL, the state could assert its hazardous waste cleanup authority. Shortly after that decision, however, the EPA placed the pond on the National Priorities List. Thereafter, the court concluded that the mere administrative act of listing the pond on the NPL stripped the court of jurisdiction which had until that time properly existed. *Id.* at 1588. Recognizing the severity of section 113, the court nevertheless indicated that it was compelled to dismiss the action. In addition, the court enjoined the state from taking any further action to enforce its hazardous waste management act at the disposal pond.

On April 6, 1993, however, the 10th Circuit reversed in pertinent part the trial court's ruling on section 113(h). *United States v. Colorado*, 990 F.2d 1565 (10th Cir.1993). The circuit found that section 113 does not impair the power of a state to enforce its EPA-delegated RCRA authority. *Id.* at 1578–79. First, the court stated that Colorado was not challenging the CERCLA cleanup action, but rather was attempting to enforce the state's parallel RCRA requirements. Second, the court held that, even if Colorado was challenging the CERCLA cleanup, the state was not without power to seek enforcement in the state courts. Section 113(h) only bars federal courts from hearing such challenges. Accordingly, the circuit reversed and remanded.

Several other courts have held that, after listing, the process of pre-cleanup investigation and selection of a remedial plan is shielded from judicial review by section 113. *See Boarhead Corp. v. Erickson*, 923 F.2d 1011 (3rd Cir.1991) (section 113 precluded judicial review of pre-cleanup studies, including remedial investigation and feasibility study); *Schalk v. Reilly*, 900 F.2d 1091 (7th Cir.), *cert. denied*, 498 U.S. 981, 111 S.Ct. 509, 112 L.Ed.2d 521 (1990) (section 113 precluded judicial review of the procedure employed to select a remedial plan); *Reynolds v. Lujan*, 785 F.Supp. 152 (D.N.M.1992) (section 113 precluded judicial review where re-

medial investigation and feasibility study had been performed).

This court, in *In re Hanford*, held that the tank waste cleanup provisions of the FFA were remedial actions selected under section 104 which were therefore shielded from review by section 113(h). The plaintiffs in *In re Hanford* sought an order directing the abatement and remediation of the risks allegedly posed by the underground storage of wastes at the Hanford Site. *In re Hanford Nuclear Reservation Litigation*, 780 F.Supp. 1551, 1557 (E.D.Wash.1991). The court stated the relevant inquiry to be whether any response actions were being specifically directed at the underground waste storage which plaintiffs challenged. The court found that:

> the efforts of EPA, DOE, and the Washington State Department of Ecology, efforts which have resulted in the formulation and implementation of a Hanford Federal Facility Agreement ("FFA") and Action Plan for the cleanup of the Hanford site ... represent precisely such actions....

*Id.* at 1559.

Fewer cases have addressed the question of whether a specific activity, called for by a cleanup plan, is part of a removal or remedial action. The one case, cited by both parties, that has squarely addressed the issue is *North Shore Gas Co. v. Environmental Protection Agency*, 930 F.2d 1239 (7th Cir.1991). The challenge in *North Shore Gas* was to the construction of a boat slip on Waukegan Harbor.

Under the provisions of a Superfund cleanup plan, embodied in a consent decree, an existing boat slip was to be converted into a toxic waste storage facility. To make up for closing the old boat slip, the consent decree also required construction of the new slip elsewhere in the harbor, yet still within the Superfund site. Plaintiffs argued that construction of the new boat slip was not "remedial action." *Id.* at 1242. Defendants moved for, and the district court granted, dismissal on the grounds of section 113.

The court noted that the purpose of section 113 is to prevent delay of cleanups. *Id.* at 1244. What is "remedial" is therefore a practical question, not a semantic one. The standard established by the *North Shore Gas* court is as follows:

> a measure that is ordered as part of a remedial plan, and that is reasonably related to the plan's objectives so that it can fairly be considered an organic element of the plan, is itself remedial within the meaning of section 113(h).

*Id.* at 1244. The court went on to note the potentially harsh consequences of section 113, yet found the action barred nonetheless.

For the purposes of the case at bar, the court notes that *North Shore Gas* suggests a two part test. First, has a given measure been ordered or selected as part of a cleanup plan. Second, is the measure reasonably related to that plan's objectives such that it can be considered an organic part of the plan. *North Shore Gas* is the only case to employ so narrow a definition of "remedial measures selected" under section 104.

Only a few cases have found that given actions related to Superfund cleanups were not "remedial." In general, these have involved actions taking place somewhere outside of the Superfund site. In *Chemical Waste Management, Inc. v. Environmental Protection Agency*, 673 F.Supp. 1043 (D.Kan. 1987), a company that received and handled wastes from Superfund sites challenged EPA's determination that the company was ineligible to receive such wastes. EPA sought to invoke section 113's jurisdictional bar. The court found section 113 did not apply as the remedy plaintiffs' sought would not slow down any specific ongoing cleanup efforts. *Id.* at 1055. Quite to the contrary, the court found that resolving the company's eligibility to process Superfund wastes would tend to speed up ongoing cleanup efforts.

Similarly, in *Werlein v. United States*, 746 F.Supp. 887 (D.Minn.1990), *vacated in part*, 793 F.Supp. 898 (D.Minn.1992), the court found that section 113 did not bar suit against the operators of a site that apparently was not listed on the NPL or involved in any other way with a Superfund cleanup. In the same case, however, the court found that section 113 did bar all claims challenging the cleanup of a federal facility under a CERC-

LA federal facility agreement. *Id.* 746 F.Supp. at 894.

Like the inquiry as to whether a given claim constitutes a "challenge," the inquiry as to whether a given action is remedial is a practical one. The court must determine whether the challenged activity is, practically speaking, part and parcel of the remedial process.

### iii. Under section 9604 (CERCLA section 104)

Section 104 provides the president with cleanup authority wherever there are actual or threatened hazardous substance releases that present a danger to the public health or welfare. The section describes investigations that the president may perform at release sites, as well as other procedures and conditions governing response actions.

Several courts have been confronted with the contention that federal facility cleanups are not conducted under section 104. This contention arises from the fact that Congress has established a special procedural regime for federal facility cleanups. CERCLA § 120, 42 U.S.C. § 9620.

Section 120 makes CERCLA applicable to federal agencies, calls for assessment of federal hazardous waste facilities, and where necessary, for listing of those facilities on the NPL. Section 120 also establishes the investigation and cleanup procedure to be followed by the EPA and the agency that owns or operates federal sites listed on the NPL. Those procedures call for a remedial investigation and feasibility study, and further require the EPA and the responsible agency to enter into an interagency agreement controlling the cleanup of the site (often called a Federal Facility Agreement). 42 U.S.C. § 9620(e).

Plaintiffs in one case claimed that section 120 creates a source of cleanup authority separate from section 104. They therefore argued that section 120 federal facility agreement cleanups do not proceed under section 104 for the purposes of section 113's jurisdictional bar. *Werlein v. United States,* 746 F.Supp. 887, 892 (D.Minn.1990), *vacated in part,* 793 F.Supp. 898 (D.Minn.1992). After

extensive discussion of the statute's structure, however, the court concluded that the cleanup authority comes from section 104 and that section 120 merely provides the special procedures or roadmap applicable to federal facilities.

This court implicitly followed *Werlein* in its *In re Hanford* decision by finding that section 113 barred plaintiffs' claims for abatement, remediation, and medical surveillance. *See In re Hanford Nuclear Reservation Litigation,* 780 F.Supp. 1551, 1561, 1565 (E.D.Wash.1991).

▮ Plaintiffs in the case at bar make substantially the same argument that was made to the *Werlein* court. They argue that section 113(h) does not apply here as the Hanford cleanup is being conducted under the authority of section 120, not section 104. Ct.Rec. 40 at 10–11. Given the convincing treatment of the issue by the *Werlein* court, and given this court's prior ruling that section 113 applies to the Hanford FFA, the court rejects plaintiffs' argument.

### C. Characterization of the Hanford Federal Facilities Agreement

▮ Given that plaintiffs' claims address activities arguably conducted under the FFA, the court must characterize the Agreement. The court must determine whether it constitutes, in its entirety, the plan for remedial action at Hanford selected under section 104. That is, the court must determine whether the FFA is a single integrated CERCLA remedial plan, or whether it is instead a divisible Agreement only part of which is a CERCLA remedial plan.

The FFA is unquestionably, in substantial part, a plan for carrying out response actions under CERCLA. The issue which the court must resolve is whether the CERCLA aspect of the Agreement is so pervasive that all activities conducted under the agreement, even those in the section that purports to be aimed at accomplishing RCRA compliance, are CERCLA response actions for the purposes of section 113.

The issue is made difficult by the fact that the Agreement never states that its principal or sole purpose is cleanup of the Hanford site

under CERCLA. Similarly, it never states that the sole authority for accomplishment of the Agreement is CERCLA, or that in the case of irreconcilable conflict CERCLA requirements will trump those of other statutes. Instead, the Agreement purports to have been made in pursuit of numerous goals, one of which is CERCLA cleanup. If there is an overriding purpose of the agreement, it appears to be a desire to provide a framework for the most efficient possible cooperation between the state, the DOE, and the EPA for management and cleanup of the site (one of the purposes of the agreement is to avoid litigation between the parties, Art. III, ¶ 13.B).

It is this cooperative and consensual nature of the agreement that creates the apparent ambiguity over which the parties are arguing. Because it is a cooperative agreement, the FFA divides tasks among the various parties apparently according to the institutional competence of the parties to handle those tasks. Along with assigning responsibility for tasks, the Agreement also designates the statutory authority under which those tasks are to be accomplished. The designation of principal statutory authority does not, however, appear to the court to have been done out of a sense of legal duty, but rather out of a sense of comity and cooperation.

### i. Integrated effort and purpose

In the Introduction to the Action Plan, the parties make the following statement:

> The parties recognize that hazardous waste compliance, permitting, closure and postclosure action, and remedial and corrective action at the Hanford Site will require a fully integrated effort involving the Federal RCRA, CERCLA, and the Washington State Hazardous Waste Management Act.

Action Plan § 1.1. While this is the closest thing to a statement of the principal purpose of the Agreement, the court believes that no reasonable reader of the FFA and Action Plan can ignore the statement's import. The court finds this highly persuasive evidence that the Agreement is the kind of integrated whole contemplated by CERCLA section 120

for implementing remedial action at the facility.

Although this statement indicates the distinct aspects of the work to be done at Hanford, that is, permitting, closure, and cleanup, it also clearly indicates the interrelatedness of the various efforts. The Agreement and the rest of the Action Plan clearly differentiate between the various tasks to be undertaken. Based on the above statement, however, this appears to be a way to break the otherwise overwhelming task into discrete pieces. The court finds this statement critical as to the obvious and powerful interrelationships between the Agreement's nominally distinct goals.

Another suggestion of the FFA's overall nature can be found in the Agreement's section on purpose. FFA, Art. III. The Agreement's first stated purpose is as follows: to "ensure that the environmental impacts associated with past and present activities at the Hanford Site are thoroughly investigated and appropriate response action taken as necessary to protect the public health, welfare and the environment." FFA, Art. III, ¶ 13.A. The other purposes listed include providing a framework for permitting Treatment, Storage, and Disposal (TSD) facilities under RCRA as well as promoting the orderly and efficient investigation and cleanup of contamination.

The language of this first stated purpose bears some distinct similarity to the language of CERCLA section 104. Where there is a release of hazardous substances into the environment, that section authorizes the president to provide for remedial action "or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment." 42 U.S.C. § 9604(a). Further, CERCLA's definition of remedial action includes "those actions consistent with permanent remedy taken ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24).

As noted above, however, the first purpose is only one of the Agreement's several expressed purposes. There is nothing about it that suggests it predominates over the others. It does, however, suggest that the Agreement as a whole is directed toward minimization of the risks of both past and present activities at the site through thorough investigation and appropriate response action. Accordingly, the court finds that the first statement of purpose indicates that the Agreement embodies a unitary CERCLA plan of action, rather than plan that is divisible into distinct CERCLA and non-CERCLA portions.

### ii. Funding

One final suggestion that the agreement as a whole embodies a CERCLA remedial plan can be found in the Agreement's funding section. FFA, Art. III. The first paragraph of the funding section indicates the parties' intention that DOE will fully fund all of its obligations under the agreement. The second paragraph indicates that Ecology and EPA will assist DOE in determining the funding levels necessary for compliance with the Agreement.

It is the third paragraph that is of particular interest. It reads: "In accordance with Section 120(e)(5)(B) of CERCLA ... DOE shall include in its annual report to Congress the specific cost estimates and budgetary proposals associated with the implementation of this Agreement." FFA, Art. XLVIII, ¶ 140. CERCLA section 120(e)(5) requires each agency that operates a federal facility listed on the NPL to provide Congress with annual reports on the status of the facility's section 120 interagency agreement and the progress of remedial investigations and response actions at the facility.

The Hanford funding provisions are in Part Five of the Agreement, which applies to Parts Two, Three, and Four of the Agreement. *See* FFA at p. 1. Accordingly, Part Five applies to both the nominally RCRA and the nominally CERCLA provisions of the Agreement. Unlike much of the rest of the Agreement, the funding provisions are not divided between RCRA and CERCLA activities.

As noted above, the first paragraph requires DOE to fund all of its obligations under the Agreement. Presumably that means both RCRA and CERCLA obligations. Further, Ecology is to assist DOE in determining appropriate funding levels. Under the division of responsibilities, Ecology is primarily associated with nominally RCRA activities. Accordingly, the court can assume that Ecology's assistance concerns primarily RCRA activities. Therefore, when the Agreement obligates DOE to report to Congress on the "the cost estimates ... associated with the implementation of this Agreement," that obligation must refer to all activities carried out under the Agreement, both those that are nominally RCRA related and those that are nominally CERCLA related.

Accordingly, the Agreement recognizes that DOE has a duty under CERCLA section 120 to report on the costs of implementing both its nominally RCRA and its CERCLA obligations under the FFA. The court finds it particularly significant that the parties have agreed that DOE's primary budgetary responsibilities under the Agreement flow only from CERCLA.

### iii. Structure

The Agreement recognizes that the CERCLA and RCRA regimes overlap significantly at times. Nonetheless, the Agreement proceeds to divide up Ecology's and EPA's responsibilities into RCRA related and CERCLA related categories. This division is reflected in the structure of the Agreement.

The Agreement is divided into five parts. *See* FFA at 1–2. Parts one and five contain provisions that apply to the entire agreement. Part four addresses the respective roles of EPA and Ecology. Parts two and three concern the actual work to be done at the site and are the sections primarily at issue here. The Agreement describes those parts as follows:

Part two contains provisions governing hazardous waste treatment, storage and disposal (TSD), hazardous waste facility permitting, closure and post-closure activi-

ties; Part Three contains provisions governing remedial and corrective action activities. . . .

FFA at 1. Later, in the provisions on jurisdiction, the parties note that the Agreement was entered into in anticipation of Hanford being placed on the NPL. They further state:

When the Hanford Site, or subareas of the Site, is placed on the NPL, Parts One, Three, Four, and Five of this Agreement shall also serve as the Interagency Agreement required by CERCLA Section 120(e). Parts One, Two, Four, and Five of this Agreement shall serve as the RCRA provisions governing compliance, permitting, closure and post-closure care of TSD units.

FFA, Art. I, ¶ 6.

The remainder of the Agreement and the Action plan follow this structural distinction between RCRA compliance for currently operating hazardous waste facilities on the one hand, and on the other, CERCLA and RCRA corrective or response actions for past releases of hazardous substances.

The court finds that Addressing RCRA compliance in a CERCLA response plan is reasonable given that CERCLA section 120(i) explicitly states that nothing in section 120 absolves federal facilities from their obligations to comply with RCRA. 42 U.S.C. § 9620(i). The question is whether, for the purposes of citizen suits, RCRA compliance activities. at a federal facility are nonetheless CERCLA response actions for the purposes of section 113(h).

Other courts presented with attempts to enforce non-CERCLA statutory duties through citizen suits have all concluded, based on the relief sought, that the claims were barred because they directly conflicted with the CERCLA cleanup. *See, e.g., Boarhead Corp. v. Erickson,* 923 F.2d 1011 (3rd Cir.1991) (judicial enforcement of National Historic Preservation Act would interfere with CERCLA pre-cleanup studies); *Reynolds v. Lujan,* 785 F.Supp. 152 (D.N.M.1992) (judicial enforcement of RCRA comprehensive cleanup standards would interfere with CERCLA activities). *United States v. Colorado,* 990 F.2d 1565 (10th Cir.1993), although

somewhat similar to the case at bar, is distinguishable. In that case, the challenge was by a state to enforce its laws that had been approved by the EPA. The challenge was not brought under citizen suit provisions.

Based on the court's reading of the FFA and the Action Plan, as discussed above, the court finds that there is compelling evidence that the FFA embodies an integrated CERCLA response action under sections 120 and 104. The court acknowledges that the Agreement itself is structured and expressed in terms of the parallel requirements of RCRA and CERCLA. As noted above, however, the court believes the Agreement's structure represents the spirit of comity and cooperation necessary to achieve the phenomenally complicated task that is the cleanup of Hanford, and not a legal separation of authority sufficient to allow this court to retain jurisdiction over citizen suits in light of section 113(h).

### iv. Parties' characterizations

Given the different ways in which the FFA can be characterized, the parties' arguments on the issue are not surprising. The bulk of parties' briefing on the jurisdictional issue consists of trying to characterize the Agreement one way or the other. The parties also devoted substantial energy to this at oral argument.

Both defendants argue that the FFA is, in its totality, a plan for CERCLA remedial action. Ct.Rec. 29 at 7–11 [WHC]; Ct.Rec. 69 at 3. Defendant United States makes the argument most succinctly.

Four areas of the Hanford Nuclear Reservation, containing the 78 operable units, were listed by the United States Environmental Protection Agency (EPA) on the National Priorities List in 1989, and investigation and cleanup of each one of those contaminated areas proceeds under the authority of CERCLA.

. . . .

DOE's willingness, by entering into the TPA [FFA], to allow Ecology to act as the lead oversight agency with respect to cer-

tain activities, did not restrict the scope of CERCLA at the site.

Ct.Rec. 69 at 3–4.

Plaintiffs have argued all along that the FFA is divisible into CERCLA and non-CERCLA activities and that the liquid discharges which they challenge are outside of the CERCLA section of the FFA and therefore ripe for review.

Although the State of Washington disagrees with plaintiffs on the merits of the case, it does agree with plaintiffs as to the characterization of the FFA. The State contends that the Tri–Party Agreement is much more than just a CERCLA remedial action plan.

> Rather, the TPA [FFA], a very complex document, requires USDOE to conduct certain remedial activity under CERCLA and RCRA, and to bring the site's 55 TSDs into compliance with Ch. 70.105 RCW. Furthermore, Milestone M–17, which does not require any removal or remedial actions under CERCLA, imposes a number or interim and final restrictions on several Hanford liquid discharges. To repeat, these restrictions have not been imposed under CERCLA and do not constitute a removal or remedial action.

Ct.Rec. 65 at 8.

After fully reviewing the parties' submissions and arguments at the hearing, and for the reasons discussed in parts i and ii above, the court finds that the FFA is an integrated CERCLA response plan and that the activities undertaken pursuant to the FFA are remedial actions selected under CERCLA section 104 and 120. Under section 113(h), the court is therefore without jurisdiction to hear any challenge to activities pursued under the FFA. The FFA's nominal division of authority does not represent division based on legal duty sufficient to avoid the bar of section 113(h). Accordingly, if plaintiffs' claims challenge activities that are reasonably related to the FFA's objectives, the court must dismiss the claims for lack of jurisdiction.

### D. Characterization of plaintiffs' claims and the challenged activities

■ Having found that the FFA is a comprehensive CERCLA cleanup plan, the final step in the analysis is to determine whether plaintiffs' claims challenge activities that are a sufficiently integral part of that plan to invoke section 113. Put differently, the issue is whether granting plaintiffs the relief they seek would be at odds with the plan established by the Agreement and the Action Plan. See, e.g., Schalk v. Reilly, 900 F.2d 1091 (7th Cir.), cert. denied, 498 U.S. 981, 111 S.Ct. 509, 112 L.Ed.2d 521 (1990).

The liquid discharges which plaintiffs claim must be permitted under the Clean Water Act are governed by Milestone M–17. That Milestone, as amended, is aimed at achieving compliance with all RCRA and state Dangerous Waste Program TSD requirements, specifically, treating or eliminating the liquid discharges at issue in plaintiffs' first cause of action. See Action Plan at § 2.4, Table 2–3. Given that the FFA's overall objective is minimizing the risk to humans and the environment from present and past practices at Hanford, FFA, Art. III, ¶ 13.A, Milestone M–17 is clearly related to that objective. Under the North Shore Gas two part test, it is both part of a Superfund cleanup plan and "reasonably related to the plan's objectives so that it can fairly be considered an organic element of the plan." North Shore Gas, 930 F.2d at 1239.

■ Plaintiffs' second cause of action, alleging violation of CERCLA and RCRA notice provisions, is also arguably addressed by the FFA. First, the tanks from which plaintiffs allege unreported leaks are themselves included in the FFA's plan to dispose of tank wastes. See Action Plan, § 2.2. Second, the FFA and the Action Plan have several provisions governing the collection, maintenance, and dissemination of information on the site, including the identification, characterization, and monitoring of wastes stored at locations all over the site. See, e.g., FFA, Art. XXXV; Action Plan § 3.5, § 9.6.

These waste information management systems are, among other things, used by the parties to set priorities for work at the site. See, e.g., Action Plan § 3.0–3.4, § 9.6.4. Ac-

**1284**

cordingly, the activity which plaintiff's challenge, the information management and dissemination system, is an integral part of the FFA's objective of addressing the site's contamination in the most efficient and appropriate manner. Additionally, granting the plaintiffs the relief they seek, including an order directing defendants to provide additional notice to the appropriate agencies, potentially injured parties, and to plaintiffs, would arguably interfere in a pragmatic sense with the information dissemination procedures established under the FFA.

The court therefore finds that both of plaintiffs' causes of action are challenges to response actions selected under CERCLA sections 120 and 104. Accordingly, **IT IS HEREBY ORDERED** that defendant Westinghouse's motion to dismiss all causes of action is **GRANTED** to the extent that the motion is based on the jurisdictional bar of CERCLA section 113(h). **IT IS FURTHER ORDERED** that plaintiffs' complaint and all causes of action therein are hereby **DISMISSED WITHOUT PREJUDICE.**

**CONCLUSION:**

During oral argument, the State of Washington expressed considerable concern over the effect of the court's ruling on the state's future opportunities to enforce the FFA. The court noted at the hearing, and repeats now for the record, that its ruling on plaintiffs' citizen suit claims in the case at bar is not a ruling on the ability of anyone to enforce the provisions of the FFA. When that issue is before the court it will be decided accordingly.

What is before the court is a challenge to activities that are squarely within the cleanup plan developed by EPA, DOE, and the State of Washington. Such a challenge is precisely the evil that Congress sought to prevent by enacting section 113(h). The magnitude of the contamination at Hanford is such that the court cannot allow the cleanup efforts being pursued by defendants and the State of Washington to be defeated or diminished by division. Congress has decided that judicial involvement in ongoing cleanups is unwise. This court has neither the power nor the inclination to ignore Congress' sage direction.

**IT IS SO ORDERED.** The Clerk is directed to enter this order and forward copies to counsel for plaintiffs, defendants, and amicus State of Washington.