**SIERRA CLUB, INC., Mary B. Edwards, Norma Caine, and Leesa Webster, Plaintiffs,**

v.

**TYSON FOODS, INC., Tyson Children Partnership, Adams Chicken Farms, Stirman Adams, Buchanan Livestock, Buchanan Farms, and Roland Buchanan, Defendants.**

**CIVIL ACTION NO. 4:02CV–73–M.**

United States District Court, W.D. Kentucky, Owensboro Division.

Nov. 7, 2003.

Aaron Isherwood, Barclay Rogers, Patrick Gallagher, San Francisco, CA, John Harbison, Ronald Shems, Shems Dunkiel & Kassel, Burlington, VT, Phillip J. Shepherd, Frankfort, KY, for Plaintiffs.

James Wendell Taylor, Lexington, KY, Judith A. Villines, Frankfort, KY, Laura D. Keller, Louisville, KY, Stites & Harbison, Flem Gordon, Gordon & Gordon, P.S.C., Madisonville, KY, for Defendants.

## MEMORANDUM OPINION AND ORDER

McKINLEY, District Judge.

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment as to the First and Second Causes of Action [DN 44]; on a motion by Defendants for summary judgment on the CERCLA and EPCRA issues [DN 49]; on a motion by Defendants, Tyson Food on its behalf and on behalf of Tyson Chicken for partial summary judgment on the issue of "person in charge" [DN 50]; on a motion by Defendant, Tyson Children Partnership, for partial summary judgment on the issue of "person in charge" [DN 48]; on a motion by Plaintiff to stay consideration of Tyson Food's motion for partial summary judgment on the issue of "person in charge" [DN 61]. Plaintiffs allege that Defendants have failed to report ammonia emissions from certain chicken production operations in Kentucky in violation of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675, and the Emergency Planning and Community Right–to–Know Act ("EPCRA"), 42 U.S.C. § 11001–11050, and also allege that the operations constitute nuisances under state law. Plaintiffs seek damages and penalties, as well as declaratory and injunctive relief. By agreement of the parties, the parties are attempting to simplify the litigation by submitting dispositive motions on certain threshold issues at the initial phase of the litigation. *See* Joint Status Report and Rule 26(f) Report of Counsel, September 10, 2002 [DN 18]. A limited amount of discovery has been conducted. Fully briefed, these matters are ripe for decision.

## STANDARD OF REVIEW

In order to grant a motion for summary judgment or for partial summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Rule requires the non-moving party to present *"specific facts* showing there is a *genuine* issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). Moreover, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## FACTS

There are four chicken production operations at issue in this case: (1) the "Tyson

Operation," consisting of 24 poultry houses, is located at or near 4200 Ilsey Road in Earlington, Hopkins County, Kentucky, and is owned by Tyson Children Partnership and leased by Tyson Chicken, Inc.; (2) the "Adams Operation," consisting of 16 poultry houses, is located near 2300 Kentucky 593 in Calhoun, McLean County, Kentucky, and is owned by Adams; (3) "Buchanan # 1 Operation," consisting of 24 poultry houses, is located at or near 1886 Gravel Pit Road and/or 53 Honeysuckle Lane, and/or 63 Davis Road in Sebree, Webster County, Kentucky, and is owned by Buchanan; and (4) the "Buchanan # 2 Operation," consisting of 16 poultry houses, is located at or near 1061 Collins Road and/or 1097 Collins Road in Sebree, Webster County, Kentucky, and is owned by Buchanan. *See* Declaration of John Blair, Exhibits A–D [DN 45].

The broiler houses are generally 40 to 43 feet wide and 400 to 500 feet long and generally 50 to 60 feet apart. The houses are roofed and insulated, and constructed to prevent entry of other animals. The chicken production farms share common access roads and interconnecting roads. Tyson Chicken[1] typically delivers between 160,000 and 180,000 chickens to a farm at a time, roughly enough to fill 8 chicken houses. Tyson Chicken delivers feed to all of Defendants' operations almost daily. Tyson Chicken formulates, makes, and owns the feed and maintains feed delivery records. Tyson Chicken retains ownership of the chickens and feed while at the chicken production operations. Through its contracts with the growers, Adams and Buchanan, Tyson Chicken mandates that they cooperate with it in adopting and/or installing recommended management practices and equipment. Tyson Chicken provides their growers with a "Broiler Growing Guide" to ensure that they raise the chickens according to Tyson Chicken standards. Under the contract, Tyson Chicken reserves the right to unfettered access to the growers' property. Tyson Chicken technical advisors visit the Adams and Buchanan operations on approximately a weekly basis. The chickens are fed, watered, and cared for by the growers—e.g. Adams and Buchanan[2]—for approximately forty-nine to fifty-one days. At that time, Tyson Chicken picks up the chickens from the facilities.

Ammonia is a colorless, irritant gas produced by decomposing animal waste. For purposes of chicken production operations, the growers grow chickens in houses on a floor of litter, generally a layer of rice hulls. When the birds defecate, their waste collects in the litter. Ventilation in the poultry houses is necessary to protect the health of the chickens and is accomplished by a combination of exhaust fans and vents. The grower controls ventilation by adjusting which fans are operating and which vents are open. Many of the ventilation tasks, along with feed, water, and heating or cooling tasks, are automated. After a flock is caught and removed for processing, the grower generally will remove a small layer of 1 or 2 inches of the litter that is usually found below the watering lines and that is found in clumps due to higher moisture content; this process of removal is called "decaking." Proper decaking is necessary to provide a

---

**1.** As discussed more fully below, because of the early stage of this litigation, the Court is unable at this time to determine the role Tyson Foods plays in both the operation of its subsidiary Tyson Chicken and in the operation/management of the poultry houses in question.

**2.** The grower for the Tyson Operation is Tyson Chicken. Tyson Chicken leases the operation from Tyson Children Partnership.

suitable environment for the placement of baby chicks for the next production cycle. The growers decake the litter after every flock, but they do a total cleanout—that is, removal of the litter, about every two years.

## STATUTORY BACKGROUND

Plaintiffs complaint alleges the chicken production operations discharge dangerous quantities of ammonia into the environment. Plaintiffs allege that Defendants have failed to report these releases to the appropriate authorities in violation of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675 and the Emergency Planning and Community Right to Know Act ("EPCRA"), 42 U.S.C. §§ 11001–11050.

CERCLA and EPCRA provide, in combination, for federal, state, and local governments to receive immediate notification of releases of hazardous substances into the environment so that these government agencies can initiate appropriate responses. Specifically, Section 103 of CERCLA provides that any person in charge of a facility from which a hazardous substance has been released in a reportable quantity (RQ) must immediately notify the National Response Center ("NRC"). 42 U.S.C. § 9603(a). Releases that exceed 100 pounds per day must be reported under section 103. 42 U.S.C. § 9603; 40 C.F.R. § 302.4. Section 103(f)(2) of CERCLA further provides for relaxed reporting requirements for substances that are classified as a continuous release. 42 U.S.C. § 9603(f).

EPCRA requires owners or operators of facilities to provide immediate notice of the release of an extremely hazardous substance or CERCLA hazardous substance to the designated state emergency response commission ("SERC") and the emergency coordinator for the appropriate local emergency planning commission ("LEPC"). 42 U.S.C. § 11004(a); 40 C.F.R. § 355.40(b)(1). The statute also requires a written follow-up emergency notice to the SERC and the LEPC "[a]s soon as practicable after a release." 42 U.S.C. § 11004(c).

CERCLA authorizes any person to "commence a civil action on his own behalf . . . against any person . . . . who is alleged to be in violation of any standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter. . . ." 42 U.S.C. § 9659(a)(1). Similarly, enforcement of EPCRA can occur through the citizen-suit provision, 42 U.S.C. § 11046(a)(1), which authorizes civil penalties and injunctive relief against "[a]n owner or operator of a facility for failure," among other things, to "[s]ubmit a follow-up emergency notice" as required under Section 304(c) of EPCRA. 42 U.S.C. § 11046(a)(1)(A)(i).

## DISCUSSION

Plaintiffs have moved for partial summary judgment as to the First and Second Causes of Action set forth in the First Amended Complaint arguing that (1) a "facility" under the definitions contained in both CERCLA and EPCRA includes multiple chicken houses that are located on single or adjacent sites within a concentrated area; and (2) that Tyson Foods, including its wholly owned subsidiary, Tyson Chicken, Inc., is an operator and thus liable under CERCLA for the unreported ammonia releases occurring at the chicken production facilities. [DN 44]. Defendants have moved for summary judgment on the CERCLA and EPCRA claims as well arguing that (1) the Plaintiffs lack standing to assert their federal statutory claims because they cannot demonstrate that non-reporting of ammonia emissions

under CERCLA and EPCRA has caused them any injury in fact; (2) that the Defendants are not in violation of CERCLA and EPCRA because they have no knowledge that a reportable quantity of ammonia has been released from any facility at issue herein; (3) that no reporting of releases under EPCRA and CERCLA is required because if any releases from chicken production operations are reportable, they are continuous; (4) that the Defendants are not required to report ammonia releases from chicken production operations because it is used in routine agricultural operations; (5) that each poultry house or litter shed is a separate facility under CERCLA and EPCRA; (6) that notification of the EPA and other agencies is not necessary because those agencies have actual knowledge of the releases in question; (7) that Defendants have been denied fair notice of any requirement to report ammonia emissions from poultry waste; (8) that the Defendants are not required to report ammonia releases from the chicken production operations because the release falls within the Fertilizer Exception under CERCLA; (9) that Tyson Foods and Tyson Chicken are not persons in charge of the Adams and Buchanan Facilities; and (10) that Tyson Children Partnership is not a person in charge of the Tyson Facility [DN 48, DN 49, DN 50].

## I. STANDING

Before the Court can examine the other issues raised by the parties, the Court must address whether the Plaintiffs have standing to assert claims under CERCLA and EPCRA. A party may not bring a suit in federal court without standing. Standing is a "core component" of the "case or controversy" requirement of Article III of the United States Constitution. *Broadened Horizons Riverkeepers v. United States Army Corps of Engineers*, 8 F.Supp.2d 730, 733 (E.D.Tenn.1998). The

standing doctrine is designed to confine the courts to adjudicating actual cases and controversies by ensuring that the "plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)(quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). To establish Article III standing to sue in federal court, an individual plaintiff must establish three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized ..., and (b) "actual or imminent, not 'conjectural' or 'hypothetical,' " .... Second, there must be a causal connection between the injury and the conduct complained of—and the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." .... Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Broadened Horizons Riverkeepers*, 8 F.Supp.2d at 733 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted)); *see also Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Cox v. City of Dallas, Texas*, 256 F.3d 281, 304 (5th Cir.2001); *Friends of the Earth v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). "[T]he 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at

563, 112 S.Ct. 2130. In short, the three constitutional requirements are injury, causation, and redressability.

■ An organization has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Com'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The party invoking federal jurisdiction bears the burden of establishing that it has standing to pursue the action. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990).

Defendants allege that Plaintiffs are unable to establish an injury in fact. Defendants maintain that the only injury that could result from the alleged reporting violation of CERCLA and EPCRA would be that the EPA would not have sufficient information to evaluate the need for action. Defendants contend that the EPA has knowledge concerning ammonia releases from chicken houses since it is now attempting to ascertain whether the current state of scientific knowledge is sufficient for establishing a reliable emission factor that could be used to determine whether reporting is required at all. Additionally, Defendants argue that Plaintiffs do not contend that they have any current evidence of the amount of any release on any particular day in a reportable amount at the farms in question-they merely contend that if they are allowed to test at the farms they believe they can show the farms will have reportable emissions. Defendants

assert that Plaintiffs' claims are therefore purely hypothetical and conjectural. Further, Defendants contend that Plaintiffs cannot establish that they have an injury that will not be redressed without a decision favorable to the Plaintiffs. Except for the argument that the individual Plaintiffs do not have standing, the Defendants have not challenged whether the organization has met the other standing requirements.

## A. Injury in Fact

■ Plaintiffs have plainly demonstrated injury in fact. The individual Plaintiffs have alleged a violation of their right to use the area around the chicken production operations without being exposed, either knowingly or unknowingly, to harmful pollutants allegedly released without proper notice. Plaintiffs allege that the ammonia emitted by Defendants' operations greatly diminish their ability to use and enjoy their property. Odors associated with the Defendants' operations force the Plaintiffs to curtail their activities on their farms and often force them to cancel outdoor events because of the odors and potentially dangerous chemicals allegedly released from Defendants' facilities. Plaintiffs have both detailed their use of the affected area, as well as the ways in which their use is threatened by the alleged releases of ammonia.[3] The facts alleged in these declarations are sufficient to meet the injury in fact requirement under *Lujan. Lujan,* 504 U.S. at 560, 112 S.Ct. 2130; *Heart of America Northwest v. Westinghouse Hanford,* 820 F.Supp. 1265, 1266–70 (E.D.Wash.1993).

■ Further, Plaintiffs also allege an injury to their right to be informed in a timely manner of any releases from the

**3.** Defendants argue that Plaintiffs have failed to allege injury in fact because the alleged injury results from releases, not from the failure to give notice. The Court will consider this argument in the discussion of causality.

operations so that they may take whatever precautionary steps are necessary. Plaintiffs argue that Defendants' failure to report the ammonia releases has harmed the Plaintiffs because it has denied them access to critical information and has impaired the ability of government agencies to properly respond to releases. Plaintiffs have alleged precisely the type of injury—failure to receive information—that Congress intended to prevent by enacting the reporting requirements of both CERCLA and EPCRA. Notably, the Supreme Court in discussing the purpose of EPCRA has stated as follows: "EPCRA establishes a framework of state, regional and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of health-threatening releases." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 86, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). It is well established that the "injury required by Article III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Warth*, 422 U.S. at 500, 95 S.Ct. 2197 (citations omitted); *see also Lujan*, 504 U.S. at 578, 112 S.Ct. 2130; *Federal Election Com'n v. Akins*, 524 U.S. 11, 20, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998)(Supreme Court noted that it "has previously held that a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Id.* at 21, 118 S.Ct. 1777).[4]

■ The Defendants further argue that Plaintiffs have failed to allege an injury in fact because they can not prove that the Defendants have released a reportable quantity of ammonia triggering the reporting requirement under either CERCLA or EPCRA. Requiring the Plaintiffs at this stage of the litigation to show the exact amount of the release of ammonia from the chicken production operations as a condition for standing "confuses the jurisdictional inquiry (does the court have power under Article III to hear the case?) with the merits inquiry (did the defendant[s] violate the law?)." *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir.2000). *See also Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 182, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Plaintiffs have presented evidence that poultry houses emit ammonia and that studies exist that estimate the amount of ammonia a poultry house emits over a specific period of time. Whether this will be sufficient to establish violations of the reporting requirements of CERCLA and EPCRA remains to be seen. However, considering that little discovery has been conducted at this stage of the litigation, the Plaintiffs need not prove that the Defendants have, in fact, violated the reporting requirements in order to obtain standing; this is instead a question of whether Plaintiffs can prove their case. *Id.*

For these reasons, the Court concludes that the Plaintiffs have alleged facts, supported by declarations, which demonstrate a concrete, actual injury and thus satisfy the first standing requirement—injury in fact.

---

4. The Court recognizes that the Supreme Court in *Steel Co.* noted that they had "not had occasion to decide whether being deprived of information that is supposed to be disclosed under EPCRA-or at least being deprived of it when one has a particular plan for its use-is a concrete injury in fact that satisfied Article III." *Steel Co.*, 523 U.S. at 105, 118 S.Ct. 1003. The Supreme Court declined to reach that question because it found that the complaint in that case failed the third test of standing, redressibility. From a review of the case law, and as discussed above, the Court believes that under the facts of the present case, the Supreme Court would find an injury in fact that satisfies Article III.

## B. Causality

■ Similarly, the Court finds that Plaintiffs have demonstrated a causal connection between the injury and the conduct complained of. The Court rejects the Defendants argument that the injury in question results from the release of the ammonia and not the Defendants failure to give notice of the release.

The purpose of CERCLA notice requirement is to provide the EPA and other regulatory agencies with the information they need to assess hazards and mitigate potential injury from releases. Similarly, EPCRA establishes a framework of agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide emergency response in the event of health-threatening releases. Without the required notices of alleged releases, regulatory agencies are without knowledge of the releases; and are consequently impeded from adequately mitigating the releases. As a result, Plaintiffs who use the affected environment are therefore injured by potential exposure to the hazardous releases. *See Heart of America Northwest,* 820 F.Supp. at 1271. The procedures which Plaintiffs seek to enforce are designed to protect Plaintiffs' interest in avoiding exposure to hazardous substances in the environment. *Id.* at 1273. Therefore, the Court finds that Plaintiffs' alleged injury is fairly traceable to the challenged actions of Defendants and thus satisfies the second standing requirement.

## C. Redressability

■ The redressability requirement ensures that a plaintiff "personally would benefit in a tangible way from the court's intervention." *Warth,* 422 U.S. at 508, 95 S.Ct. 2197; *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 162 (4th Cir.2000). A plaintiff seeking injunctive relief, as in the present case, demonstrates redressability by "alleg[ing] a continuing violation or the imminence of a future violation" of the statute at issue. *Steel Co.,* 523 U.S at 108, 118 S.Ct. 1003. Plaintiffs seek injunctive and other relief for Defendants alleged continuing and threatened future violations of the reporting requirements.

■ In the present case, a decision favorable to the Plaintiffs would redress their injuries because it would require the Defendants to provide notice that a specific episodic release of a hazardous substance has occurred or that specific continuous releases will occur in the future which would allow the Plaintiffs to take whatever precautionary steps necessary to protect themselves from the ammonia releases.

Furthermore, although the EPA, along with other governmental agencies, may already know that the poultry houses emit high levels of ammonia and, as Defendants argue, may be studying ways to effectively measure such release, such defense is inappropriate to challenge standing where what the Plaintiffs seek is enforcement of statutes Congress designed in part for Plaintiffs' benefit. *See Heart of America Northwest,* 820 F.Supp. at 1273 (citing *Women's Equity Action League v. Cavazos,* 879 F.2d 880, 886 (D.C.Cir.1989)). The notice requirements under CERCLA and EPCRA are designed to enable the appropriate governmental agencies to respond to hazardous releases and under EPCRA, specifically, to notify the public of such releases. It is therefore reasonable for the Court to also find that if Defendants complied with the notice requirements, then the appropriate governmental agencies might respond to the release.

For these reasons, the Court finds that Plaintiffs' alleged injury is likely to be

redressed by a decision on the merits that is favorable to Plaintiffs.

Based on the above discussion, the Court finds that the individual Plaintiffs, as well as Sierra Club, have standing to assert claims under CERCLA and EP-CRA.

## II. EXEMPTION FOR ANIMAL PRODUCTION OPERATIONS

■ Defendants argue that there is no generally accepted methodology or model for estimating the amount of ammonia chicken production facilities emit. According to Defendants, the EPA is currently addressing the issue of whether there is reliable science to determine whether reporting is required for these type of facilities, and as a result, they are not required to report ammonia releases. The problem with this argument is that Defendants cite no authority which exempts animal production facilities from the reporting requirements of EPCRA and CERCLA. If Congress had intended such a result, it could have excluded animal production facilities, such as poultry and swine, from the reporting requirements. Congress clearly knew how to exempt certain items from the reporting requirements of CERCLA and EPCRA as demonstrated by the fertilizer exclusion under CERCLA Section 101(22)(D) which exempts "the normal application of fertilizer" from the definition of release. 42 U.S.C. § 9601(22)(D).

■ Furthermore, the fact that the EPA has not chosen to enforce these provisions against animal production facilities does not prohibit a citizen enforcement suit for violation of the reporting requirements. The Supreme Court has recognized that the purpose of citizen suits is not to supplant governmental enforcement by subjecting a defendant to duplicative enforcement, but to step in when local agencies fail to exercise their enforcement responsibility. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation,* 484 U.S. 49, 60, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). If the EPA were enforcing these provisions, this suit would not be necessary.

■ Similarly, the fact that the government has knowledge of ammonia emissions from chicken houses does not necessarily exempt Defendants from the reporting requirements. The Government would not require notice of specific releases of hazardous substances if it was not already aware that such substances at or above the reportable quantity were harmful.[5]

Additionally, the Defendants maintain that if the Court determines that reporting of poultry emissions is required, it would be a violation of due process to penalize them because the laws and regulations do not provide fair warning that they must file emergency reports for routine agricultural emissions. The Defendants ask that the Plaintiffs' claim for penalties be dismissed. As stated above, it appears to the Court that statute clearly does not exclude the release of ammonia from chicken or livestock production operations, and as a result, Defendants are required to report releases that meet or exceed the reportable quantity. For purposes of the motion for summary judgment, the Court denies

---

5. The Defendants do not dispute that both CERCLA and EPCRA require persons in charge or owners and operators of facilities to report releases of ammonia in excess of 100 pounds per day to the appropriate federal, state and local authorities. 42 U.S.C. § 9603(a); 40 C.F.R. § 302.6; 42 U.S.C. § 11004(a)(3). What is in dispute in this case is whether these notice requirements apply to releases of ammonia from chicken production operations.

Defendants' motion to dismiss the civil penalties with leave to reargue this issue at a later date after the liability of Defendants has been determined.

## III. KNOWLEDGE

 Plaintiffs have alleged that the Defendants have violated the reporting requirements of CERCLA and EPCRA. Plaintiffs maintain that they need only demonstrate that Defendants knew of a release of ammonia, not that the Defendants knew that it was of a reportable quantity. Defendants disagree.

> CERCLA Section 103(a) provides:
>
> Any person in charge of ... an onshore facility shall, as soon as **he has knowledge of any release (other than a federally permitted release) of a hazardous substance from such ... facility in quantities equal to or greater than those determined pursuant to section 9602 of this title,** immediately notify the National Response Center....

42 U.S.C. § 9603(a). The language in the statute is plain. To prove a violation of the reporting requirements, Plaintiffs must show not merely that Defendants knew of a release, but that Defendants knew that a reportable quantity of ammonia was released. The EPA, administrative law judges, and other courts have indicated that knowledge that a release is of a reportable quantity is necessary to impose a requirement to file a report. *See United States v. Buckley,* 934 F.2d 84, 89 (6th Cir.1991)("The district court properly charged jurors that to prove Buckley guilty of failure to notify, the government needed to prove that Buckley '*knew* of the release of more than one [1] pound of asbestos....' " *Id.*).

However, the cases cited by the Defendants reflect that courts interpreting the knowledge requirement have indicated that knowledge can be either actual knowl-

edge or constructive knowledge. *See In the Matter of Thoro Products Co.,* 1992 EPA ALJ LEXIS 523, 1992 WL 143993 (May 19, 1992). The Administrative Law Judge in *Thoro Products* held that to establish a violation of the reporting provisions, a plaintiff must present facts which show the following:

> first, that the owner or operator [or person in charge] of the ... facility had actual knowledge of a release of an RQ or more of [a hazardous substance] or that he or she possessed knowledge of such circumstances as would ordinarily lead upon investigation, in the exercise of reasonable diligence which a prudent person ought to exercise, to a knowledge of a release of an RQ or more of [a hazardous substance] ..., and, second, that the owner or operator failed to report the release immediately after such knowledge was acquired or may be constructed....

*Id.* Therefore, actual or constructive knowledge of a release of a reportable quantity creates a duty to report.

Defendants also argue that Plaintiffs have failed to set forth proof that emissions from the poultry houses exceed the reportable quantities, and as a result, Plaintiffs' claims fail. Plaintiffs have presented evidence that poultry houses emit ammonia and that studies exist that estimate the amount of ammonia a poultry house emits over a specific period of time. For example, Plaintiffs' have alleged that a 24–house chicken production facility, like the Tyson Facility, releases at the lowest estimate approximately 235 pounds of ammonia into the environment every day. As noted above, whether this will be sufficient to establish violations of the reporting requirements of CERCLA and EPCRA remains to be seen. However, considering that little discovery has been conducted at this stage of the litigation, the Plaintiffs

need not prove that the Defendants have, in fact, violated the reporting requirements in order to survive this initial motion. There are currently genuine issues of material fact regarding the amount of ammonia released by each facility and whether "the owner or operator" or "person in charge" had knowledge or was aware of such release.

## IV. FACILITY

One of the main issues before the Court is whether under the emergency reporting requirements of both CERCLA and EPCRA the term "facility" includes every poultry house or litter shed at the farm site. Plaintiffs argue that each farm site, consisting of several poultry houses on a contiguous site, releases more than 100 pounds of ammonia daily. Plaintiffs maintain that the whole farm site is the proper regulated entity for purposes of the CERCLA and EPCRA reporting requirements. The Court agrees.

### A. CERCLA

CERCLA Section 101(9) defines "facility" as follows:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

■ Defendants maintain that under CERCLA each poultry house is a "facility" for purposes of CERCLA's Section 103 reporting requirement. Defendants argue that because CERCLA defines "facility" as

"any building" each poultry house is a facility. Defendants contend that each case relied upon by the Plaintiffs addresses cost recovery actions under Section 107 and/or Section 113(f) of CERCLA and, therefore, none of those cases have any applicability to this case. Defendants argue that the detailed definition set forth in definition (A) of "facility" should be selected to accomplish the purpose of CERCLA Section 103 which is prompt notification of emergency releases, rather than the broad definition set forth in definition (B). Defendants rely on an unpublished Western District of Oklahoma case in which the district court held that "facility" refers to each separate building or structure, not the entire site. *Sierra Club v. Seaboard Farms, Inc.*, No. CIV–00–997–C (W.D.Okla. July 18, 2002).

After a review of the parties arguments and case law, the Court finds that a whole chicken farm site is a facility from which releases must be reported under CERCLA. First, Defendants are correct that CERCLA § 101(9)(A), defines facility to mean "any building, structure, installation, equipment, . . . ." 42 U.S.C. 9601(9)(A). But in relying on this provision, they ignore CERCLA § 101(9)(B) which defines a facility as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9)(A). Under CERCLA § 101(9)(B), the entire farm site, including all the chicken houses on a single site, qualifies as a facility.

■ Courts have consistently interpreted the term "facility" broadly. In instances where the hazardous substance or contamination is confined to an individual building or structure, the facility is properly limited to this unit. However, when multiple sources of hazardous substances

are grouped together, the facility encompasses the entire area and extends to "the bounds of the contamination." *United States v. Township of Brighton,* 153 F.3d 307, 313 (6th Cir.1998). Under the case law, if an area is managed as a whole, it is a single facility for CERCLA purposes. *Id.; United States v. 150 Acres of Land,* 204 F.3d 698, 709 (6th Cir.2000); *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.,* 191 F.3d 409, 417–18 (4th Cir.1999)(because "a property could be divided [into multiple facilities] does not, however, mean that it must be so divided for CERCLA purposes"); *Akzo Coatings, Inc. v. Aigner Corp.,* 960 F.Supp. 1354, 1359 (N.D.Ind.1996), *aff'd in part, vacated in part by,* 197 F.3d 302 (7th Cir.1999) (rejecting the argument that each contamination source is a separate facility because such argument "could have disastrous consequences, for ultimately every separate instance of contamination, down to each separate barrel of hazardous waste, could feasibly be construed to constitute a separate CERCLA facility"); *Cytec Industries v. B.F. Goodrich Co.,* 232 F.Supp.2d 821 (S.D.Ohio.2002)("This court concludes that usually, although perhaps not always, the definition of facility will be the entire site or area, including single or contiguous properties, where hazardous wastes have been deposited as part of the same operation or management." *Id.* at 836); *Clear Lake Properties v. Rockwell Int'l Corp.,* 959 F.Supp. 763, 767–68 (S.D.Tex.1997)(rejecting an attempt to create unnatural boundaries between a building and the site on which it is located). Under the facts of the present case, each of the four chicken production operations, encompassing all the poultry houses at one site, is operated together for a singular purpose. The poultry houses at a particular site function together to produce chickens. Chickens of an identical age typically occupy multiple chicken houses at once. They are delivered and picked up from the site as a whole. Tyson Chicken's technical advisors visit the multiple houses within the site during their periodic visits. Since each chicken production operation operates as a single operation, it is a single facility for CERCLA purposes. *Id.*

Second, the Defendants are correct in that the cases upon which both the Plaintiffs and the Court rely to support the expansive definition of "facility" have involved Section 107 and Section 113(f) cost recovery actions. CERCLA permits government agencies and private parties that have incurred cleanup costs to sue potentially responsible parties to recover their costs pursuant to CERCLA Sections 107 and 113(f). 42 U.S.C. §§ 9607, 9613(f). While the Defendants are correct that none of these cases that have explored the definition of "facility" were Section 103 reporting requirements cases, the Court can find no rational reason to disregard these cases in discussing the definition of the term "facility" in a Section 103 reporting case. The Supreme Court has recognized that "identical words used in different parts of the same act are intended to have the same meaning." *Sorenson v. Secretary of Treasury,* 475 U.S. 851, 860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986). CERCLA defines "facility" once in the definition section of the statute and its meaning should be interpreted consistently throughout the entire statute. Accordingly, "facility" for reporting purposes, cleanup purposes or any other statutory purpose extend under the case law to the bounds of the contamination.

Defendants cite *Sierra Club v. Seaboard Farms, Inc.* in support of their position. *Seaboard Farms* is the only federal court opinion cited to the Court that deals with the term "facility" under Section 103 of CERCLA. The district court in *Seaboard Farms* held that "facility" refers to each

separate building and structure, not the entire site. *Sierra Club v. Seaboard Farms, Inc.*, No. Civ–00–997–C (W.D. Okla. February 5, 2002 and July 18, 2002). This case is currently on appeal to the Tenth Circuit. Specifically, in *Sierra Club v. Seaboard Farms, Inc.*, the district court examined Section 103 reporting of ammonia releases from hog waste. The site at issue contained multiple wastewater lagoons and sow barns. The Sierra Club argued that the entire site was the "facility" from which the alleged releases occurred, and that all emissions from the lagoons and barns should be aggregated before determining whether the reportable quantity for ammonia had been reached or exceeded. Ultimately, the district court concluded that each lagoon and barn was a separate facility under CERCLA relying on the fact that facility was defined to mean "any buildings," not "all buildings." Ultimately, the problem with the district court opinion in *Seaboard Farms* is that while the court quoted the entire definition of facility under 42 U.S.C. § 9601, the court did not address whether the hog farm, including the lagoons or barns, was "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed or otherwise come to be located." 42 U.S.C. § 9601(9)(B).

Third, contrary to the Defendants' argument, the purpose of Section 103 is best served by a broad definition. CERCLA is a remedial statute designed to protect human health and the environment from potentially hazardous substances. The purpose of Section 103 has been described by the EPA as "to alert the appropriate government officials to releases of hazardous substances that may require rapid response to protect public health and welfare and the environment." 50 Fed.Reg. 13,456 (1985). Including all chicken houses on a single site within one facility will further the purposes of the statute by determining

the aggregate emission from the chicken houses on that site. Plaintiffs' have alleged that a 24–house chicken production facility, like the Tyson Facility, releases approximately 235 pounds of ammonia into the environment every day. Under the Defendants' interpretation, the Tyson Facility would not be required to report any releases because each chicken house only releases approximately 10 pounds of ammonia per day, even though each site as a whole releases more than twice the reporting threshold. A definition of a facility that encompasses the entire chicken production facility is the only interpretation of the statute that meets CERCLA's basis purpose: to protect and preserve public health and the environment. The Court finds no reason to treat the definition of facility any differently in emergency reporting cases.

Finally, both parties cite EPA regulations and guides in support of their respective positions. The Court has reviewed these references and finds arguable support for both of their positions. While the Court is cognizant that where a statute is unclear, the Court must defer to the EPA's interpretation so long as it is based on a permissible construction of the statute. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, where as here, the EPA regulations are not helpful in answering the question before the Court, no deference is required. Congress has defined the term "facility" and courts have interpreted that provision. The Court shall instead defer to this case law.

Therefore, for purposes of the CERCLA Section 103 reporting requirements, each chicken production operation, including the separate chicken houses, is a facility. Emissions from the separate poultry houses are required to be added together to

determine if a reportable quantity has been reached for the facility.

## B. EPCRA

Under EPCRA, an owner or operator of a facility must report to state and local emergency planning committees the release of a hazardous substance. 42 U.S.C. § 11004(a)(1), (3). Specifically, EPCRA provides that "[i]f a release of an extremely hazardous substance referred to in Section 11002(a) of this title occurs from a facility at which a hazardous chemical is produced, used, or stored, and such release requires notification under section 103(a) of [CERCLA], the owner or operator of the facility shall immediately provide notice as described in subsection (b) of this section." 42 U.S.C. § 11004(a)(1). EPCRA defines "facility" as follows:

> The term "facility" means all buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites and which are owned or operated by the same person (or by any person which controls, is controlled by, or under common control with, such person). For purposes of section 11004 of this title, the term includes motor vehicles, rolling stock, and aircraft.

42 U.S.C. § 11049(4).

Each of defendants' chicken production operations is a facility under this definition. The chicken production operations include multiple chicken houses that are located on single or adjacent sites within a concentrated area. These chicken houses are owned by the same person for purposes of producing chickens. Accordingly, each of defendants' chicken production operations is clearly a facility under EPCRA from which ammonia releases must be reported on a site-wide basis.

For the reasons set forth above, the Court concludes that a whole chicken farm site is a facility under both CERCLA and EPCRA for which releases must be reported.

## V. EPISODIC OR CONTINUOUS RELEASES

Under CERCLA, a continuous release is subject to reduced reporting requirements. Specifically, Section 103(f) provides that "[n]o notification shall be required under subsection (a) or (b) of this section for any release of a hazardous substance .... (2) which is a continuous release, stable in quantity and rate ...." and has been qualified as a continuous release. 42 U.S.C. § 9603(f)(2). In order to qualify for reduced reporting under CERCLA § 103(f), the person in charge must demonstrate a "sound technical basis" for claiming that a release is continuous rather than episodic. 40 C.F.R. § 302.8(e). Specifically, the EPA has provided that

> [t]o qualify a release for reporting as a continuous release, you must establish a basis for asserting that the release is continuous and stable in quantity and rate. The Continuous Release Rule provides you with flexibility in establishing this basis. You may report the release to either the NRC (for CERCLA hazardous substances) or the appropriate SERC and LEPC (for CERCLA hazardous substances and non-CERCLA EHSs) on a per-occurrence basis for the period of time necessary to establish that the pattern of the release is continuous and stable. However, if you have a sufficient basis for establishing the continuity, quantity, and regularity of a release, multiple reports are not necessary. A one-time telephone call to each of the appropriate authorities (the NRC, SERC, and LEPC for CERCLA hazardous substances, or only the SERC and LEPC for non-CERCLA EHSs) will

alert them to your intent to report the release as a continuous release.

EPA Guide, Reporting Requirements for Continuous Releases of Hazardous Substances at 5 (1997). Additionally, the EPA has provided that "[i]f the person in charge does not have a basis supported by existing data, engineering estimates, operating history and experience, or professional judgment sufficient to qualify for reporting under section 103(f)(2), the release must be reported under section 103(a) for the length of time necessary to establish it as continuous and stable under the definition in today's rule." 55 Fed. Reg. 30172 n. 5 (1990). Therefore, the person in charge must "qualify releases as continuous and stable" to benefit from the reduced reporting requirement of CERCLA § 103(f). If the person in charge fails to do so, any release equaling or exceeding the reportable quantity must be reported as episodic release under CERCLA § 103(a).

Similarly, the regulations implementing EPCRA provide that the reporting requirements of this section do not apply to "[a]ny release that is continuous and stable in quantity and rate under the definitions of 40 C.F.R. 302.8(b). Exemption from notification under this subsection does not include exemption from: (A) Initial notifications as defined in 40 C.F.R. 302.8(d) and (e)...." 40 C.F.R. § 355.40(a)(2)(iii)(A).

■■■ Defendants argue that any releases occurring at the facilities are continuous releases subject to reduced CERCLA reporting requirements and entitled to full exemption from EPCRA reporting requirements. Defendants further contend that even if initial reporting of continuous releases is required under EPCRA under § 304(a) and (b), no follow-up notification under § 304(c) is required. Defendants maintain that because citizen suits under EPCRA are only authorized to enforce § 304(c), not §§ 304(a) and (b), Plaintiffs' claims under EPCRA must be dismissed.

First, and most significantly, Defendants have not met the requirements necessary to classify the releases as continuous under § 103(f)(2). The person in charge (or the owner or operator) has not notified any agency of any releases, let alone established that these releases are continuous rather than episodic and warrant reduced reporting requirements. The person in charge under CERCLA or the owner or operator under EPCRA has the responsibility to qualify the releases as continuous and stable. Since the person in charge has not done so, any release equaling or exceeding the reportable quantity must be reported as an episodic release under both CERCLA and EPCRA.

Second, if the Defendants had complied with Section 103(f) and the ammonia releases were classified as continuous, the reduced reporting requirements under CERCLA and EPCRA would apply. Defendants have argued that EPCRA requires no reporting of continuous releases because the initial notification referenced at 40 C.F.R. § 355.40 require initial telephone notification and initial written notification only under CERCLA Section 103. See 40 C.F.R. § 302.8(d) and (e). Additionally, the Defendants argue that even if initial notification is required, follow-up notification under Section 304(c) is not required for continuous releases under EPCRA. However, after a review of the regulations, the Court concludes that initial notification under Section 304(a) and (b) and follow-up written notification under Section 304(c) of EPCRA are still required for continuous releases.

The regulations provide that "initial notifications as defined in 40 C.F.R. 302.8(d) and (e)" are not exempt from the EPCRA reporting requirements. 40 C.F.R.

§ 355.40(a)(2)(iii)(A). Title 40 C.F.R. Section 302.8(e) provides that in addition to the CERCLA initial reporting requirements, the reporting requirements of EPCRA require "initial telephone and written notifications of continuous releases to be submitted to the appropriate" SERC and LEPC. Therefore, under EPCRA, the initial telephone notification occurs under Section 304(a) and (b) and written notification occurs in an "emergency follow-up report" pursuant to Section 304(c). The Court's interpretation of this regulation is confirmed by the EPA's comments concerning continuous release reporting requirements:

> To the extent that releases are continuous and stable in quantity and rate as defined by CERCLA section 103(f)(2) and today's final rule, they do not occur in a manner that requires notification under CERCLA section 103(a). Accordingly, when persons in charge of facilities or vessels releasing EHSs or CERCLA hazardous substances submit the initial notification reports (**including the initial written reports, which should be submitted with the follow-up report required by SARA Title III section 304(c)**) to the appropriate SERC and LEPC, identifying releases of EHSs and CERCLA hazardous substances as continuous and stable in quantity and rate under the definition in today's final rule, they need not report again to SERC and LEPC, except for reports of SSIs [Statistically Significant Increase]. No CERCLA section 103(f)(2) follow-up reports are required under SARA Title III section 304.

55 Fed.Reg. 30166, 30179 (emphasis added). Therefore, under the regulations, both initial telephone notification under Section 304(a) and (b) and follow-up written notification under Section 304(c) are required under EPCRA. Therefore, Plaintiffs may maintain a claim against Defendants for their alleged violation of EPCRA's § 304(c) reporting requirements even if the releases could be characterized as continuous.

As discussed above, however, Defendants have not met the requirements of . § 103(f)(2), the appropriate initial notification has not been made, and as result, the ammonia releases from Defendants' facilities have not been classified as continuous. Accordingly, episodic reporting appears to be required if the ammonia releases from the facilities in question equal or exceed the reportable quantity. Defendants' motion for summary judgment on Plaintiffs' EPCRA claims is denied.

## VI. ROUTINE AGRICULTURAL OPERATIONS

Defendants argue that as "routine agricultural operations" poultry production operations are exempt from EPCRA reporting. EPCRA Section 311 provides an exemption for reporting releases when the regulated substance "is used in routine agricultural operations or is a fertilizer held for sale by a retailer to the ultimate consumer." 42 U.S.C. § 11021(e)(5). Defendants claim that the EPCRA exemption applies because chicken waste is removed from chicken production operations and used on other farms for fertilizer. The Court disagrees.

The EPA has indicated that this exemption is intended to "eliminate reporting of fertilizers, pesticides, and other chemical substances when applied, administered, or otherwise used as part of routine agricultural activities ... The exemption for substances used in routine agricultural operations applies only to substances stored or used by the agricultural user." 52 Fed. Reg. 38344, 38349 (1987). In the present case, Plaintiffs contend that the venting of gaseous ammonia into the atmosphere

must be reported under EPCRA, not that the storage of chicken manure or the application of chicken manure to farm fields is subject to the reporting requirements. The Defendants do not store gaseous ammonia in their chicken houses for agricultural use. They do not use this ammonia in an agricultural operation. Instead, as pointed out by the Plaintiffs, the Defendants try to get rid of it because it is harmful to the chickens. Accordingly, the Court finds that the routine agricultural use exemption does not apply to the facts of this case.

## VII. APPLICATION OF FERTILIZER EXEMPTION

CERCLA § 101(22)(D) exempts "the normal application of fertilizer" from the definition of "release." 42 U.S.C. § 9601(22)(D). This exemption is incorporated into EPCRA by 40 C.F.R. § 355.40(a)(2)(v). Defendants argue that under this exemption their releases of ammonia to soils, water or air as a consequence of spreading chicken waste on fields as fertilizer do not require reporting under either CERCLA or EPCRA.

The Plaintiffs state in response to this argument that they do not allege that the land application of chicken manure as fertilizer is a release under CERCLA or EPCRA. Instead, the Plaintiffs allege that venting gaseous ammonia into the atmosphere from the chicken houses is subject to the reporting requirements of CERCLA and EPCRA. The Defendants are not applying ammonia to farm fields when they vent it into the atmosphere, and as a result, the exemption for land application of fertilizer does not apply.

It should be noted that the Plaintiffs have stated that they are not alleging in their complaint that the storage of chicken manure or the application of chicken manure to farm fields is subject to CERCLA or EPCRA. The case is therefore limited to the allegations that the venting of gaseous ammonia into the atmosphere from the chicken houses must be reported under these statutes.

## VIII. PERSON IN CHARGE/OWNER OR OPERATOR

Plaintiffs have filed a motion for partial summary judgment on the issue of whether Tyson Foods, Inc., including its wholly owned subsidiary, Tyson Chicken, Inc., is a person in charge or "operator" of the chicken production facilities at issue in this case, and thus liable for unreported ammonia discharges under CERCLA and EPCRA [DN 44]. Defendant, Tyson Foods, on its behalf and on behalf of its wholly owned subsidiary, Tyson Chicken, Inc., has filed a motion for partial summary judgment on the issue of whether it is a "person in charge" of a facility and on other issues related to corporate liability [DN 50]. Tyson Foods argues that it is neither a person in charge under CERCLA or an owner or operator under EPCRA of any of the chicken production operations at issue in this matter. Similarly, it argues that Tyson Chicken is neither a person in charge nor an owner or operator of the chicken production operations owned by Adams or Buchanan. Defendant, Tyson Children Partnership, has also filed a motion for partial summary judgment on the issue of whether it is a "person in charge" of a facility and on other issues related to corporate liability [DN 48].

The relationships between Tyson Foods, Tyson Chicken, and Tyson Children Partnership and the chicken production operations at issue in this case are central to the determination of whether these Defendants are persons in charge or owners or operators of the chicken production facilities in question. Generally, Tyson Foods

produces, distributes, and markets chicken, beef, pork, prepared foods and related products. Tyson Chicken, Inc., is a wholly owned subsidiary of Tyson Foods. Under the facts currently available, Tyson Chicken manages the Tyson Facility and supplies, pursuant to contract, chicks, feed, technical advise and veterinary services, among other things, to both the Adams and Buchanan Facilities. Tyson Chicken, Inc. operated under the Hudson Foods name until January 1, 2001, when it changed its name to Tyson Chicken. All shares of Tyson Chicken are owned by Tyson Foods and Tyson Chicken is identified as a subsidiary of Tyson Foods, Inc. Additionally, Tyson Chicken currently leases property on which the Tyson Facility is located from Tyson Children Partnership.

## A. Definitions

### 1. Person in Charge

■■■ Plaintiffs contend that the Defendants violated CERCLA, 42 U.S.C. § 9603(a), which provides that:

Any **person in charge** of . . . an onshore facility shall, as soon as he has knowledge of any release (other than a federally permitted release) of a hazardous substance from such . . . facility in quantities equal to or greater than those determined pursuant to section § 9602 of this title, immediately notify the National Response Center. . . .

42 U.S.C. § 9603(a). Therefore, to be liable under 42 U.S.C. § 9603(a), a Defendant must be considered a person in charge of a facility. A corporation is included in the definition of "person" under CERCLA. 42 U.S.C. § 9601(21). Unfortunately, "person in charge" is not defined either in CERCLA or its implementing regulation. Plaintiffs contend that a "person in charge" under CERCLA includes not only supervisory personnel who have the responsibility

for the facility, but also the owner or operator of a facility. Defendants disagree that an owner or operator is automatically a "person in charge" under CERCLA.

In *United States v. Carr,* 880 F.2d 1550 (2d Cir.1989), the Second Circuit discussed the definition of "person in charge" under 42 U.S.C. § 9603(a) in the context of a criminal action against a supervisor who directed a work crew to dispose of waste cans of paint at an Army base in an improper manner and failed to report the release of hazardous substances under CERCLA. A jury convicted the supervisor of CERCLA reporting violations. The supervisor appealed on the basis of the jury instruction regarding the meaning of "in charge." The question before the Second Circuit was whether an employee who had actual supervisory control over the releases of hazardous materials could be held liable as a "person in charge."

After recognizing that CERCLA contained no definition for the term "in charge," the Second Circuit turned to CERCLA's legislative history, which showed that this provision of CERCLA was modeled after the reporting requirement section of the Clean Water Act, 33 U.S.C. § 1321(b)(5). The Second Circuit held:

The legislative history of section 311 bears out appellant's argument that CERCLA's reporting requirements should not be extended to *all* employees involved in a release. "The term 'person in charge' [was] deliberately designed to cover only supervisory personnel who have the responsibility for the particular vessel or facility and not to include other employees." H.R. Conf. Rep. No. 940, 91st Cong., 2d Sess. 34 (1970), *reprinted in* 1970 U.S.Code Cong. & Admin. News 2691, 2712, 2719. Indeed, as the Fifth Circuit has stated, "to the extent that legislative history

does shed light on the meaning of 'persons in charge,' it suggests at the very most that Congress intended the provisions of [section 311] to extend, not to every person who might have knowledge of [a release] (mere employees, for example), but only to persons who occupy positions of responsibility and power." *United States v. Mobil Oil Corp.,* 464 F.2d 1124, 1128 (5th Cir.1972).

That is not to say, however, that section 311 of the Clean Water Act—and section 103 of CERCLA—do not reach lower-level supervisory employees. The reporting requirements of the two statutes do not apply only to owners and operators, *see United States v. Greer,* 850 F.2d 1447, 1453 (11th Cir.1988), but instead extend to any person who is "responsible for the operation" of a facility from which there is a release, *Apex Oil Co. v. United States,* 530 F.2d 1291, 1294 (8th Cir.), *cert. denied,* 429 U.S. 827, 97 S.Ct. 84, 50 L.Ed.2d 90 ... (1976). As the Fifth Circuit noted in *Mobil Oil,* imposing liability on those "responsible" for a facility is fully consistent with Congress' purpose in enacting the reporting requirements. Those in charge of an offending facility can make timely discovery of a release, direct the activities that result in the pollution, and have the capacity to prevent and abate the environmental damage. *See Mobil Oil,* 464 F.2d at 1127.

*Carr,* 880 F.2d at 1554. Plaintiffs claim that under *Carr,* an owner and operator is always a "person in charge" for CERCLA reporting purposes. According to Plaintiffs, in addition to imposing reporting requirements on owners and operators, CERCLA also extends reporting obligations to other persons who are likewise in a position to detect the release, including those of relatively low rank. *See also United States v. Mobil Oil Corp.,* 464 F.2d 1124, 1126 (5th Cir.1972).

The Court has reviewed *Carr,* as well as the cases cited by the Second Circuit in *Carr,* and finds that in each case the courts focused on the fact that the "person" in question was "actively involved in the daily operation of the business," had "the capacity to make timely discovery of oil discharges," and had the "power to direct the activities of persons who control the mechanisms causing the pollution." *See Greer,* 850 F.2d at 1453; *Mobil Oil,* 464 F.2d at 1127. Each of the powers of the "owner-operator" discussed in these cases concerns the element of *control* exerted over the facility. From a review of this case law, the Court concludes that the proper inquiry in determining whether the Defendants qualify as a "person in charge" should be whether the Defendants "occupy positions of responsibility and power" and whether they are in a position to "make timely discovery of a release, direct the activities that result in the pollution, and have the capacity to prevent and abate the environmental damage." *Carr,* 880 F.2d at 1554. Therefore, the Court declines to define person in charge to always include "owner or operator." While in most cases an owner or operator will qualify as a "person in charge," this determination will depend on the nature and degree of control the person has over the facility in question.

## 2. Operator

Plaintiffs contend that the Defendants violated EPCRA, 42 U.S.C. § 11004(a), which provides that:

If a release of an extremely hazardous substance referred to in section 11002(a) of this title occurs from a facility at which a hazardous chemical is produced, used, or stored, and such releases requires notification under section 103(a) of [CERCLA] ..., the owner or opera-

tor of the facility shall immediately provide notice. . . .

42 U.S.C. § 11004(a). Therefore, to be liable under 42 U.S.C. § 11004(a), a Defendant must be considered an "owner or operator" of the facility. The term operator is not defined in either EPCRA or its regulations. However, in light of EPCRA's close connection with CERCLA, the Supreme Court's analysis of "operator" found in *United States v. Bestfoods* is also applicable to EPCRA. *United States v. Bestfoods*, 524 U.S. 51, 66–67, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). The Supreme Court has held that

> [A]n operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Id.* at 66–67, 118 S.Ct. 1876.

**B. Tyson Foods**

Plaintiffs have moved to stay consideration of Tyson Foods, Inc.'s motion for partial summary judgment on the issue of whether it is a "person in charge" of a facility and other issues related to corporate liability [DN 61]. Plaintiffs maintain that Tyson Foods has not meaningfully responded to the Plaintiffs' discovery requests regarding Tyson Foods involvement with the chicken production facilities at issue in this litigation, including its relationship with its subsidiary, Tyson Chicken. Specifically, Plaintiffs complain that Tyson Foods did not produce the docu-

ments requested by Plaintiffs until after it filed its motion for. summary judgment. And when Tyson Foods did finally produce the additional documents, Plaintiffs maintain that its limited production did not satisfy the Plaintiffs' request. As a result, Plaintiffs claim that they lack essential facts to oppose Tyson Foods' motion for partial summary judgment on the issue of "person in charge."

Summary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery. *Vance v. United States*, 90 F.3d 1145, 1148 (6th Cir.1996). Rule 56(f) of the Federal Rules of Civil Procedure provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).

Plaintiffs have informed the Court that additional discovery is needed to defend against Tyson Foods' motion for partial summary judgment. Because of the limited amount of discovery conducted, the Court will allow Plaintiffs the opportunity to seek further discovery regarding the relationship between Tyson Foods and the chicken production facilities, including Tyson Chicken. The Court is cognizant of Defendants' claims that Plaintiffs have failed to file a motion to compel discovery of this information. However, with discovery limited to select threshold issues and given the recent addition of Tyson Chicken into this litigation,[6] the Court is reluctant

---

**6.** In November of 2002, the Court granted Defendant Tyson Foods' motion to amend its

answer to assert that Tyson Chicken was actually the corporation involved with the chicken

to conclude that the Plaintiffs have not been diligent in seeking the discovery necessary to respond to Tyson Foods' motion for summary judgment.

The Plaintiffs are reminded that under CERCLA and EPCRA, they are required to prove that Tyson Foods is a person in charge or an operator as the Court has defined these terms in order to impose the reporting requirements of CERCLA and EPCRA on Tyson Foods. Plaintiffs have repeatedly stated that they need more discovery to determine the relationship between Tyson Foods and Tyson Chicken. However, the Court would caution the Plaintiffs that the United States Supreme Court in *Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, has held that the focus should instead rest "on the relationship between [the parent corporation] and the ... facility itself." *Id.* at 68, 118 S.Ct. 1876.

For the reasons set forth above, Tyson Foods' motion for summary judgment on the "person in charge" issue is denied with leave to refile after completion of discovery. Because the Court has chosen to reexamine this issue as it relates to Tyson Foods after completion of discovery, Plaintiffs' motion to stay consideration of Tyson Foods' motion on the issue of person in charge is therefore denied as moot. Plaintiffs should seek appropriate discovery motions to obtain the information allegedly withheld by the Defendants pursuant to the new scheduling order which shall be prepared by the Magistrate Judge.

## C. Tyson Chicken

Tyson Foods on behalf of its wholly owned subsidiary, Tyson Chicken, has filed a motion for partial summary judgment arguing that Tyson Chicken is not liable for the alleged unreported ammonia releases under CERCLA and EPCRA because it is not a person in charge, owner or operator of the Adams and Buchanan Facilities. Plaintiffs have also filed a motion for summary judgment against Tyson Chicken arguing that it is a person in charge and operator of the Adams, Buchanan, and Tyson Facilities.

### 1. CERCLA

As discussed above, to be held liable under CERCLA section 103(a), a Defendant must be considered a "person in charge" of a facility. The factors that determine whether Tyson Chicken is a "person in charge" of a facility include whether Tyson Chicken "occupies [a] position[ ] of responsibility and power," and whether Tyson Chicken is in a position to "make timely discovery of a release, direct the activities that result in the pollution, and have the capacity to prevent and abate the environmental damage" at the facility in question. *Carr,* 880 F.2d at 1554.

Tyson Chicken is clearly a person in charge of the Tyson Facility and is directly responsible for the alleged ammonia discharges from that chicken production facility. Tyson Chicken leases this facility from the Tyson Children Partnership, and Tyson employees perform all the duties necessary to raise the chickens at this facility. It clearly occupies a position of responsibility and power and is in a position to make timely discovery of releases, directs the activities that result in the pollution, and has the capacity to prevent and abate the environmental damage. *Carr,* 880 F.2d at 1554. Tyson Chicken appears to concede its role as a "person in charge" of the Tyson Facility.

As to the Adams and Buchanan facilities, Tyson Chicken asserts that it is not a "person in charge" of those facilities. Tyson Chicken argues that under the

production facilities. The motions for summary judgment were filed in March of 2003.

terms of its Grower Contracts with the Adams and Buchanan farms, Tyson Chicken merely provides chicks, feed, veterinary services, medication, and technical advice to the contract growers. According to Defendants, the Broiler Growing Guide only provides written guidelines that have proven effective. The technical advisors are the only employees of Tyson Chicken who have regular contact with the farms and the farm managers. Defendants assert that the technical advisors visit the farms periodically to observe the growing conditions and to make recommendations to aid in the contract grower's performance. According to Defendants, these technical advisors are not at the farms every day, and even when they are there, they are not present for an entire day—they may visit one or more farms in a day. Defendants argue that the broiler visitation reports reflect that the technical advisors do not have sufficient involvement with the farms so as to be considered persons in charge of the facilities as that term is applied for purposes of the CERCLA reporting requirement.[7] Defendants argue that since the technical advisors who are Tyson Chicken employees are only present on the farms a few days during a grow cycle, they are not involved in the daily operations of the farms, and they are not in the **best** position to detect, prevent or abate a release of a substance. As a result, Defendants argue that Tyson Chicken is not a person in charge of the Adams and Buchanan Farms. The Court disagrees.

Contrary to Defendants' argument, the standard is not whether Tyson Chicken is in the **best** position to detect, prevent or

abate a release of ammonia. Instead, the reporting requirements apply to any person who is a position to detect, prevent, and abate a release of hazardous substance. There may be several "persons in charge" at the same facility. *See United States v. Hansen*, 262 F.3d 1217, 1253–54 (11th Cir.2001), *cert. denied*, 535 U.S. 1111, 122 S.Ct. 2326, 122 S.Ct. 2327, 153 L.Ed.2d 158 (2002). Therefore, under the definition of person in charge both the growers and Tyson Chicken could be found to be a person in charge.

Tyson Chicken seeks to insulate itself from the reporting requirements of both CERCLA and EPCRA by claiming that Adams and Buchanan are independent contractors solely responsible for environmental compliance at the chicken production facilities. Whether Tyson Chicken is a person in charge is determined by examining the relationship between it and the facility and not by how the parties choose to characterize their relationship. The Alabama Supreme Court in *Tyson Foods, Inc. v. Stevens*, 783 So.2d 804, 809 (Ala. 2000) addressed a similar issue. In *Stevens*, the Alabama Supreme Court found Tyson's control of its growers so complete that it held that an individual that raised hogs for Tyson was its "agent" and upheld a $25,000 punitive damages verdict against Tyson and its grower for mismanagement of the hog operation. Interpreting a contract similar to the ones in this case, the Alabama Supreme Court refused to find the grower to be an "independent contractor," as the contract provided. The Supreme Court noted stated that:

7. Specifically, Defendants point to the documents presented in Jeffrey Power's deposition which showed that a technical advisor visited the Onton # 1 farm six times in connection with one flock. One of the six visits was for a pre-brood report and one was on the day of placement, on June 14, 2002. These reports suggest that once the chicks were placed on the farm, the technical advisor, who is an employee of Tyson Chicken, visited the farm only four more times during the 49 to 51 day grow period, on June 18, 20, 25 and July 24, 2001. Similar frequencies of visits are suggested by other reports.

The [plaintiffs] presented evidence indicating that Tyson specified where the hog houses should be located and how large each house should be, and that Tyson even arranged for financing of the houses. Tyson required that [the growers] implement a specific waste-management system. It inspected [the grower's] hog operation almost every week and, as evidenced by the inspection reports and photographs, recommended solutions for Burnett's waste-management problems. Tyson provided the hogs and provided food, veterinary supplies, and veterinary care for the hogs. [The grower's] primary responsibility was to feed, water, and otherwise care for the animals. The evidence was sufficient to create a jury question as to the existence of an agency. Therefore, the trial court did not err in sustaining the jury's verdict as to this issue.

*Stevens,* 783 So.2d at 809. While the *Stevens* case does not address liability under CERCLA or EPCRA, the Court finds that it does adequately describe the Tyson's relationship, or in this case Tyson Chicken's relationship, with its growers.

After a review of the record, the Court concludes that no reasonable juror could differ on the issue of whether Tyson Chicken is a person in charge of both the Adams and Buchanan Facilities. Tyson Chicken is clearly in a position of responsibility and power with respect to each facility and is in a position to make a timely discovery of a release, direct the activities that result in the ammonia releases, and has the capacity to prevent and abate the alleged environmental damage. *See Carr,* 880 F.2d at 1554.

Tyson Chicken is involved in the facility design and equipment specifications. Tyson Chicken directs growers how to build and orient the houses, how to heat, cool, ventilate the buildings, and how to illumi-

nate the house to ensure optimum chicken growth. Tyson Chicken provides exacting equipment specification and advises growers as to the proper retailers from which to purchase this equipment. If a grower chooses to deviate from Tyson Chicken's specification or growing instructions, Tyson Chicken reserves the right to refuse to deliver chicks or seize the property in question. Tyson Chicken owns the chickens throughout the production process, including the period the chickens are located at the chicken production facility. In fact, Tyson Chicken provides not only the chicks, but the feed, technical support, medicine, and veterinary care for the chicks. Additionally, the evidence reflects Tyson Chicken not only controls the product, but payment and some expenditures at the chicken production facilities.

Most importantly, Tyson Chicken technical advisors monitor the Adams and Buchanan facilities. They provide detailed instructions to the growers. Tyson technical advisors test ammonia levels inside the house and direct ventilation program to exhaust ammonia into the environment. The record reflects that Tyson Chicken directs its growers to discharge ammonia from the chicken houses at the production facilities. The Broiler Growing Guide specifically instructs growers to exhaust ammonia into the environment to limit ammonia buildup inside the chicken houses. Tyson technical advisors also routinely visit the production facilities and tell the growers to discharge ammonia into the environment. For example, (1) one Tyson Chicken technical advisor noted in his broiler visitation report that "[a]mmonia is in all of the houses" and instructed Adams to "up the ventilation to thirty more seconds," (Rogers Decl. ¶ 11, Exh. I Broiler Visitation Report, TY–BVR–000104); (2) another Tyson Chicken technical adviser noted in a broiler visitation report that

"[t]he ventilation set up [at the Adams facility] looks good and is according to our program," (Rogers Decl. ¶ 11, Exh. I Broiler Visitation Report, TY–BVR–000120); (3) another Tyson Chicken technical advisor directed Adams to "[r]un [ventilation fans] 30 sec[onds] out of 10 min[utes] to evacuate ammonia," (Rogers Decl. ¶ 11, Exh. I Broiler Visitation Report, TY–BVR–000159); (4) one Tyson Chicken technical advisor informed Buchanan "I tested the Ammonia Levels in houses 1 & 8.... These levels are too high," (Rogers Decl. ¶ 11, Exh. I Broiler Visitation Report, TY BVR 000669); and (5) a different Tyson Chicken technical advisor told Buchanan "to increase Fan time. I am starting to see some blind birds in the houses. We need to get the Ammonia out of these houses." (Rogers Decl. ¶ 11, Exh. I Broiler Visitation Report, TY BVR 000602). Tyson Chicken technical advisers are present at the facility on weekly basis and are in a position to make a timely discovery of some of the releases, Tyson Chicken directs the discharge of ammonia from the chicken production facility through the Broiler Growing Guide and individual instructions from the technical advisors, and Tyson Chicken has the capacity to prevent and abate the alleged environmental damage.

For these reasons, the Court concludes that Tyson Chicken is a "person in charge" of the Tyson, Adams, and Buchanan Facilities and is subject to the reporting requirements of CERCLA.

### 2. EPCRA

■■■ As discussed above, to be held liable under EPCRA section 304(a), a defendant must be considered an "owner or operator" of a facility. The parties agree that Tyson Chicken is not the owner of the Tyson, Adams or Buchanan Facilities.

Therefore, the question is whether Tyson Chicken is an operator of those facilities.

■■■ "[A]n operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." *Bestfoods,* 524 U.S. at 66, 118 S.Ct. 1876. More specifically, the Supreme Court has held that to be considered an operator a defendant must "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66–67, 118 S.Ct. 1876. Clearly, Tyson Chicken is an operator of the Tyson Facility. It manages, directs and conducts the affairs of the facility. Similarly, for the reasons set forth in the Court's discussion of "person in charge," the Court concludes that these facts clearly demonstrate that Tyson Chicken is an operator of the chicken production facilities owned by Adams and Buchanan as well. Tyson Chicken manages and/or directs many of the operations related to the venting of ammonia. Finding that no reasonable juror could differ on this issue, the Court concludes that Tyson Chicken is an operator of the Adams and Buchanan Facilities and is subject to the reporting requirements of EPCRA.

For all the reasons set forth above and finding no genuine issues of material fact with respect to these issues, the Court grants Plaintiffs' motion for summary judgment with respect to whether Tyson Chicken is a "person in charge" or an "operator" of the Adams, Buchanan, and Tyson Facilities under CERCLA and EP-CRA.

### D. Tyson Children Partnership

Tyson Children Partnership has filed a motion for partial summary judgment arguing that it is not liable for alleged unreported ammonia releases at the Tyson Fa-

cility under CERCLA or EPCRA. The Partnership leases the "Tyson Facility" property to Tyson Chicken, a wholly owned subsidiary of Tyson Foods, Inc. The Partnership acquired the property from owners who were parties to a grow contract with Hudson Foods, the predecessor of Tyson Chicken. The former owners informed Hudson that they intended to abandon the property and the flocks of chicken then housed there. Exercising its rights under the contracts, Hudson stepped in to manage the flocks until the birds reached maturity. The Partnership bought the property, and by lease dated September 15, 2000, leased it to Hudson for fifteen years. Tyson Chicken is now the lessee.

The Partnership is only a lessor of property and has no other role in these broiler production facilities. The question before the Court is whether the Partnership is liable under CERCLA or EPCRA for the alleged failure to report ammonia releases at the Tyson Facility. The Partnership's role, or lack of role, at the Adams and Buchanan Facilities is not at issue.

### 1. CERCLA

As discussed above, to be held liable under CERCLA section 103(a), a Defendant must be considered a "person in charge" of a facility. In order for the Partnership to be deemed a "person in charge" of the Tyson Facility, the Partnership must "occupy [a] position[ ] of responsibility and power," and must be in a position to "make timely discovery of a release, direct the activities that result in the pollution, and have the capacity to prevent and abate the environmental damage." *Carr*, 880 F.2d at 1554.

 The Partnership is not involved in the daily operations of the chicken production operations and is not in a position to detect, prevent and abate a release of haz-

ardous substances. The Partnership does not contract with any growers. No evidence suggests that the Partnership plays any role in the chicken production operations at issue on a routine basis such that it could be said that it is responsible for the operations or that it is a position to detect, prevent, and abate the release of hazardous substances. For these reasons, as a lessor of the property in question with no active role in managing the property, the Partnership is not a "person in charge" of the Tyson Facility and as result, had no responsibility under CERCLA to report the alleged releases of ammonia. *See, e.g., Neighbors for a Toxic Free Community v. Vulcan Materials Co.,* 964 F.Supp. 1448, 1454 (D.Colo.1997). All claims against Tyson Children Partnership under CERCLA are dismissed.

### 2. EPCRA

 As discussed above, to be held liable under EPCRA section 304(a), a Defendant must be considered an "owner or operator" of a facility. "[A]n operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." *Bestfoods,* 524 U.S. at 66, 118 S.Ct. 1876. Specifically, the Supreme Court has held that to be deemed an operator a defendant "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66–67, 118 S.Ct. 1876. For the reasons set forth in the Court's discussion of the Partnership's liability under CERCLA, no evidence suggest that the Partnership manages, directs, or conducts the activities of the Tyson Facility related to pollution. Therefore, the Partnership is not an "operator" of the Tyson Facility.

Plaintiffs argue that Tyson Children Partnership is still liable under the EPCRA reporting statutes because of the clear statutory requirements that owners of facilities must report releases of hazardous substances. Plaintiffs maintain that it is clear that the Partnership owns the Tyson Facility and leases it to Tyson Chicken, Inc.

The Court agrees with the Plaintiffs that Tyson Children Partnership owns the land and its buildings on which the Tyson Facility is located. However, this fact alone does not resolve the question of whether Tyson Children Partnership is subject to the reporting requirements of EPCRA. In *Neighbors for a Toxic Free Community v. Vulcan Materials Co.*, 964 F.Supp. 1448 (D.Colo.1997), the court rejected arguments similar to those made by the Plaintiffs. In that case, General American Transportation Corporation (GATC) owned a railroad tank car that it leased to Vulcan Material Company. Toxic materials were released from the tank car while it was at the Vulcan terminal. In determining the liability of the lessor under the EPCRA reporting statute, the district court held that "[s]ince GATC was not in charge and had no knowledge, notification by GATC was not required." *Vulcan Materials*, 964 F.Supp. at 1454. The district court further held that the plaintiff's interpretation of the statute and regulations unreasonable "since it would require any lessor of any type of equipment to file a full EPCRA report when a toxic spill occurs, even when the lessor has no knowledge or ability to do this." *Id.*

Applying the principle in *Vulcan Materials* to this case, a lessor of property who has no control over the operations of a facility or knowledge of a release of a reportable quantity of a hazardous substance is not subject to the reporting requirements of EPCRA. This is consistent with the purpose of EPCRA which is to establish a framework of agencies designed to inform the public about the presence of hazards and toxic chemicals, and to provide emergency reporting in the event of health-threatening releases. Under the facts of this case, it is clear that Tyson Children Partnership is a lessor of the property and that Tyson Chicken is the lessee of the property and is the "operator" of the chicken production facility in question. A question of fact exists concerning whether Tyson Children Partnership, as the lessor of the property, is in a position to have knowledge of the alleged releases or the ability to report the alleged releases. The facts may reveal that the Partnership is not in such a position. However, at this stage of the litigation, the Court finds that a genuine issue of material fact exists concerning whether the Partnership had knowledge of releases of ammonia at or above the reportable quantity or had the ability to report such releases from the Tyson Facility.

For these reasons, the motion by Defendant, Tyson Children Partnership, for partial summary judgment against Plaintiffs on the issue of "person in charge" and "operator" is granted and the motion by Defendant for partial summary judgment on the issue of "owner" is denied.

## IX. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** as follows:

(1) The motion by plaintiffs for partial summary judgment as to the First and Second Causes of Action [DN 44] is **granted in part and denied in part.**;

(2) The motion by Defendants for summary judgment on the CERCLA and EPCRA issues [DN 49] is **denied;**

(3) The motion by Defendant, Tyson Foods on its behalf, for partial summary

judgment on the issue of "person in charge" [DN 50] is **denied with leave to refile** after discovery;

(4) The motion by Defendant, Tyson Foods on behalf of Tyson Chicken, for partial summary judgment on the issue of "person in charge" [DN 50] is **denied;**

(5) The motion by Defendant, Tyson Children Partnership, for partial summary judgment on the issue of "person in charge" [DN 48] is **granted** and the motion by Defendant, Tyson Children Partnership, for partial summary judgment on the issue of "owner and operator" [DN 48] is **granted in part and denied in part.**

(6) The motion by Plaintiff to stay consideration of Tyson Foods' motion for partial summary judgment on the issue of "person in charge" [DN 61] is **denied as moot.**